903 A.2d 1139

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Mark Duane EDWARDS, Jr., Appellant.**

Supreme Court of Pennsylvania.

Submitted March 9, 2005.

Decided Aug. 21, 2006.

Reargument Denied Oct. 25, 2006.

156

Susan Elizabeth Ritz, for Mark Duane Edwards, Jr.

Nancy D. Vernon, Amy Zapp, Harrisburg, for Com.

BEFORE: CAPPY, C.J., CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## *OPINION*

Justice CASTILLE.

Appellant appeals from the judgment of sentence imposing a penalty of death for each of three first-degree murder convictions, and lesser sentences for the second-degree murder of an unborn child and other offenses. Because we find no merit to the issues raised by appellant, we affirm the judgment of sentence.

On the morning of April 14, 2002, the North Union Volunteer Fire Department and the Pennsylvania State Police responded to a fire in a double-wide mobile home in North Union Township, Fayette County. Corporal Andre Stevens of the Pennsylvania State Police happened to be in the area, and, when he responded to the scene, he found twelve-year-old

Larry Bobish, Jr., suffering from gunshot wounds to his hand and neck. The boy told Corporal Stevens that "Marky" shot him. After the fire was extinguished, officers entered the residence where they found the dead bodies of the child's father, Larry Bobish, Sr., his mother, Joanna Marian Bobish, and his pregnant seventeen-year-old sister, Krystal Leigh Bobish. Larry Jr. was shot through his left hand into his neck, and also suffered a laceration to his neck. He survived, but the bullet that entered his neck remained lodged near his spinal column.

At appellant's trial, Larry Jr. testified that approximately a year before the murders, his mother and sister started using a controlled substance known as "wet" and that his father, who was on disability, sold "wet."[1] Larry Jr. testified that, at approximately 6 a.m. on April 14, 2002, he was sleeping on the living room couch when he was awakened by his father answering the door. Joanna Bobish was asleep in her bedroom and Krystal was sleeping in Larry Jr.'s bedroom. Larry Jr. saw appellant, who was a friend of Krystal, enter the house. After Larry Sr. and appellant went into the kitchen, Larry Jr. heard two gunshots and the sound of a body falling to the ground. Appellant then ran into the living room carrying a black automatic handgun and shot Larry Jr. Next, appellant ran into Joanna's bedroom, and Larry Jr. heard another gunshot. At that point, Krystal came out of the bedroom in which she had been sleeping and told appellant to stop. Appellant approached Krystal and shot her. Krystal fell to the ground, at which point appellant swore at her and kicked her.

Larry Jr. got up and approached appellant, who started striking him while the boy begged appellant to stop. Appellant then cut Larry Jr. on the neck, shoulder and back. Larry Jr. fell to the ground and heard appellant running through the kitchen and down the stairs into the basement. At some

1. "Wet," also known as "sherm" or "water," is formaldehyde laced with Phencyclidine (PCP). A user dips a filterless cigarette into the liquid and then smokes the drug-laced cigarette.

point, the boy awoke and realized that the home was on fire. He ran outside and lay in the driveway, screaming for help.

Corporal Stevens testified that he was off-duty delivering newspapers in the Bobishes' neighborhood with his three sons when he observed that the roof of the Bobish home was on fire. Corporal Stevens approached the Bobish residence with one of his sons where he encountered the Bobishes' neighbor and saw Larry Jr. lying on the driveway covered in blood from his head to his waist. Corporal Stevens asked Larry Jr. if there was anyone in the house, and Larry responded that his parents and sister were inside. Corporal Stevens attempted to enter the home but was unable to do so due to the fire. An ambulance arrived, and one of the attendants began tending to Larry Jr., who told the attendant that "Marky" had assaulted him. On April 18, 2002, four days after the murder, Larry Jr. identified appellant by name as the person who committed the murders, and he picked appellant's photograph out of a photo line-up presented to him at the hospital by Corporal Stevens.

Aaron Coleman, Chief of the North Union Volunteer Fire Department, testified that he arrived at the scene at approximately 7 a.m., at which time the Bobish residence was fully engulfed in flames. The fire was extinguished in approximately fifteen minutes, and Chief Coleman was then able to enter the home where he found three bodies, one in the living room, one in the kitchen, and one in the bedroom area. State Trooper William Large was present at the scene and later testified as an expert in fire investigation. Trooper Large stated that two separate fires were set inside the Bobish home, one in the living room and one in the bedroom area. He concluded that the fires were intentionally set and, therefore, classified the fire as arson.

Appellant's friend, Brooke Porter, testified that, on the afternoon of April 13, 2002, appellant spent a few hours with her. Appellant came to Porter's house, where they engaged in sexual intercourse. Then, as they were getting ready to leave Porter's house, Porter testified, appellant "just started talking crazy" because Larry Sr. had been paging him. Appellant told Porter that he had stolen "water" from Larry Sr.

and stated that if he was going to go to jail for robbery, he wanted to go to jail for life. He described for Porter a plan to go to the Bobish residence, knock on the door, tell Larry Sr. he had the money and then kill him.

Recardo Williams testified that on Saturday, April 13, 2002, at approximately 10 p.m., he was in a home in Uniontown with four or five other people, one of whom was appellant. Williams, who was thirteen years old in 2002, testified that he knew appellant and overheard a conversation in which appellant stated that he was going to shoot a family and then stab them. According to Williams, appellant intended to shoot the family and then "cut somebody if he had no more bullets." *Id.* at 184–86, 192.

Dr. Cyril H. Wecht, M.D., the Coroner of Allegheny County, reviewed the autopsies of the three victims, performed at the request of the Fayette County Coroner, and prepared the final autopsy reports. Dr. Wecht concluded that Larry Sr.'s cause of death was a gunshot wound to the chest with perforations of both lungs and heart, resulting in bleeding into both the right and left thoracic cavities and pericardial sac. There was no evidence that Larry Sr. was alive at the time of the fire. Dr. Wecht found that Joanna's cause of death was a gunshot wound to the neck with damage to the critical nerves and blood vessels supplying the heart and the lungs. Joanna's examination revealed no evidence that she was alive at the time of the fire. Dr. Wecht testified that Krystal's cause of death was a transection of her spinal column, which resulted from a gunshot wound with its point of entry in her cheek. Krystal had also expired by the time the fire was set. Krystal's autopsy also revealed a twenty-eight-week-old viable male fetus in utero, which died because of a lack of oxygen after the death of his mother. Dr. Wecht testified that the manner of death for all three victims and the unborn child was homicide.

State Trooper John F. Marshall testified that appellant was apprehended on April 18, 2002, and transported to the state police barracks, where Trooper Marshall met him. The troop-

er read appellant the *Miranda*[2] warnings, appellant waived his rights, and appellant began to make a statement. Trooper Marshall interrupted to ask if appellant wanted an attorney, and when appellant responded that he did, the interview was terminated, and the trooper left the interview room. A short time later, Trooper Marshall returned to the interview room and again read the *Miranda* waiver form to appellant, who again signed the document. Appellant then indicated that he wanted to give a statement "to make peace with God." Trooper Marshall asked again if appellant wished to waive his right to an attorney, and appellant stated that he wanted to speak to the trooper without an attorney.

Appellant told Trooper Marshall that, on April 12, 2002, he went with Jeff Johnson and a girl named Gina to the Bobish residence to buy "wet." After smoking all of the drugs, they returned to the Bobish house and stole six bottles of "wet" from Larry Sr. at gunpoint. After the robbery, Bobish began paging appellant and, when appellant called the residence, he was told that the Bobish family was planning to call the police if appellant did not pay for the drugs. The next day, appellant went to the home of his friend, Brooke Porter, and informed her that he was going to rob Larry Sr. again and kill him. At approximately 5 a.m. on April 14, appellant woke up, smoked two bottles of the drugs, and walked to the Bobish house. Larry Sr. let him in the front door and asked him for the money owed, whereupon appellant shot Larry Sr. and then Krystal. Appellant stated that he did not remember shooting Joanna or Larry Jr. Appellant then set fire to the house, first by igniting a blanket in Joanna's bedroom.

Appellant was tried before a jury in May of 2004. Appellant testified in his own behalf, and claimed that he awoke on Sunday, April 14, 2002, at approximately 6 a.m. at Nancy McGruder's house and then walked to his grandmother's house where his aunt let him in. He went into the living room, where he fell asleep until his aunt woke him with food. Appellant denied that he went to the Bobish residence on

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Sunday morning, denied that he saw any member of the Bobish family and denied that he shot or stabbed any member of the family. Appellant further claimed that the confession which Trooper Marshall read into the record was false.

The jury found appellant guilty of three counts of first degree murder,[3] and single counts of second degree murder (respecting Krystal's unborn child),[4] criminal attempt to commit homicide (respecting Larry Jr.),[5] arson[6] and burglary.[7] Following a penalty hearing, as to the murders of Larry Sr. and Joanna Bobish, the jury found two aggravating circumstances[8] and three mitigating circumstances[9] and then determined that the aggravating circumstances outweighed the mitigating circumstances. As to Krystal Bobish, the jury found the same aggravators and mitigators along with the additional aggravating circumstance that, at the time of the killing, the victim was in her third trimester of pregnancy or the defendant had knowledge of the victim's pregnancy.[10] Once again, the jury determined that the aggravating circumstances outweighed the mitigating circumstances. Thus, the jury returned a penalty verdict of death on each of the three first-degree murder convictions pursuant to 42 Pa.C.S. § 9711(c)(1)(iv). In addition to formally imposing the death sentences, the trial court later sentenced appellant to a con-

3. 18 Pa.C.S. § 2502(a).

4. 18 Pa.C.S. § 2502(b).

5. 18 Pa.C.S. § 901.

6. 18 Pa.C.S. § 3301(a).

7. 18 Pa.C.S. § 3502(a).

8. The jury found as aggravating circumstances that appellant knowingly created a grave risk of death to another person in addition to the victim (42 Pa.C.S. § 9711(d)(7)) and that appellant was convicted of another murder committed at the time of the offense at issue (42 Pa.C.S. § 9711(d)(11)).

9. In terms of mitigation, the jury found that appellant had no significant history of prior criminal convictions (42 Pa.C.S. § 9711(e)(1)), that appellant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (42 Pa.C.S. § 9711(e)(3)), and the catchall mitigator (42 Pa.C.S. § 9711(e)(8)).

10. 42 Pa.C.S. § 9711(d)(17).

secutive term of life imprisonment for the second-degree murder of Krystal Bobish's unborn child, and lesser terms of imprisonment on the remaining convictions.

In all death penalty direct appeals, this Court reviews the evidence to ensure that it is sufficient to support the first-degree murder verdicts, whether or not the appellant specifically raises the issue. *Commonwealth v. May*, 584 Pa. 640, 887 A.2d 750, 753 (2005) (citing *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) and *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385, 402 (2003), *cert. denied*, 543 U.S. 822, 125 S.Ct. 30, 160 L.Ed.2d 31 (2004)). When reviewing the sufficiency of the evidence, this Court examines whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as the verdict winner, are sufficient to establish all elements of the offense beyond a reasonable doubt. *Id.* (citing *Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859, 864 (2000)). The evidence is sufficient to establish first-degree murder where the Commonwealth proves that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with the specific intent to kill. *Id.* (citing 18 Pa.C.S. § 2502(d); *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (2000)). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). The Commonwealth may establish that a defendant intentionally killed another solely by circumstantial evidence, and the fact finder may infer that the defendant intended to kill the victim based upon the defendant's use of a deadly weapon on a vital part of the victim's body. *May*, 887 A.2d at 753 (citing *Commonwealth v. Rivera*, 565 Pa. 289, 773 A.2d 131, 135 (2001), *cert. denied*, 535 U.S. 955, 122 S.Ct. 1360, 152 L.Ed.2d 355, (2002)).

In this case, appellant challenges the sufficiency of the evidence to sustain his convictions for first-degree murder and

for burglary.[11] With respect to the murder convictions, appellant does not dispute that he killed the victims, instead disputing only his degree of guilt. Appellant's argument, however, is perfunctory, as he outlines the governing review standard and then summarily states, without elaboration, that: the testimony did not show that he had a specific intent to kill; Dr. Wecht's testimony did not establish that Krystal Bobish was shot in a vital part of her body; and "no testimony was shown on [sic] Larry Bobish, Sr. or Joanne Bobish that there was premeditation." Brief of Appellant, 23.

We are satisfied that the evidence adduced at trial, which we have summarized above, overwhelmingly established appellant's guilt for all three first-degree murders. On Friday, April 12, 2002, appellant and a friend stole drugs from Larry Bobish, Sr., at gunpoint. Following the robbery and throughout the next day, Larry Sr. paged appellant, seeking to be paid for his illicit goods and threatening to call the police. Appellant told a friend he was planning to go to the Bobish home, ostensibly to pay for the stolen drugs, but with the actual intention of killing Larry Sr. In the early morning hours of Sunday, April 14, 2002, appellant did just that: he went to the Bobish residence, armed with a gun, and then shot and killed Larry Sr. Appellant then proceeded to shoot the remaining members of the Bobish family, killing Joanna Bobish and her pregnant daughter Krystal, and seriously wounding Larry Jr., whom he also stabbed. Finally, after leaving all of his victims for dead, appellant set the home on fire and fled. Larry Jr. told a state trooper and a paramedic at the scene that "Marky" committed the murders and he later identified appellant, whom he knew, as the perpetrator.

After being apprehended four days later and twice waiving his *Miranda* rights in writing, appellant gave a statement to state police admitting to killing Larry Sr. and Krystal, but claiming that he did not recall shooting Joanna or Larry Jr. Autopsies revealed that Larry Sr., Joanna and Krystal all died of gunshot wounds and that the viable fetus in Krystal's

---

11. Appellant does not challenge the sufficiency of the evidence with respect to his remaining convictions.

uterus died of oxygen deprivation as a result of Krystal's death. The coroner concluded that all of the deaths were the result of homicide.

An arson investigation determined that the fire in the Bobish home had been deliberately set. Moreover, and despite appellant's argument to the contrary, it is clear that Krystal was shot in a vital part of her body and that the circumstances warranted an inference of specific intent to kill as to her murder. As Dr. Wecht testified, Krystal was shot in her cheek and the bullet traveled to her spine, transecting it. Appellant shot Krystal in the head, clearly a vital part of her body, then kicked her and cursed at her, thus making his intent even more clear, left her for dead, and set the home on fire.

When viewed in the light most favorable to the Commonwealth as the verdict winner, this evidence in combination with all reasonable inferences derived therefrom was sufficient to permit the jury to conclude, beyond a reasonable doubt, that appellant intentionally, deliberately, and with premeditation shot and killed Larry Bobish Sr., Joanna Bobish and Krystal Bobish. There is no question that the victims were unlawfully killed and that appellant committed the murders. The fact that the victims were assaulted with deadly weapons on vital parts of their bodies, combined with the evidence that appellant told his friend, Brooke Porter, that he planned to kill Larry Sr. and was overheard by Recardo Williams to say that he intended to kill an entire family by shooting until he ran out of bullets and then stabbing them, was sufficient to permit the jury to find that appellant harbored the specific intent to kill the entire Bobish family. Accordingly, appellant's claim that the evidence was insufficient to support his first-degree murder convictions fails.

With respect to his burglary conviction, appellant argues that the evidence was insufficient because Larry Sr. permitted him to enter the Bobish home. The Commonwealth counters that appellant gained entry to the Bobish home by deception because, according to the testimony of Brooke Port-

er, appellant planned to tell Larry Sr. that he was there to pay for the stolen drugs and then, once he secured entry, he would kill Larry Sr. "A person is guilty of burglary if he enters a building or occupied structure, or separately secured or occupied portion thereof, with intent to commit a crime therein unless the premises are at the time open to the public or the actor is licensed or privileged to enter." 18 Pa.C.S. § 3502(a). This Court has held that the license or privilege to enter exception recognized by the burglary statute can be negated by deception:

> It is true that a person who is licensed or privileged to enter a building cannot be convicted of burglary even if he intends to commit a crime once in the building. See, *Commonwealth v. Corbin,* 300 Pa. Superior Ct. 218, 446 A.2d 308 (1982). The element of license and privilege, however, like that of consent, can be vitiated if they are induced by deception or from one who is intoxicated and unable to make a reasonable judgment as to the nature or harmfulness of the situation at hand. See, *Commonwealth v. Hayes,* 314 Pa. Superior Ct. 112, 460 A.2d 791 (1983); 18 Pa.C.S. § 311(c) 2, 4.

*Commonwealth v. Thomas,* 522 Pa. 256, 561 A.2d 699, 705 (1989). Appellant fails to acknowledge the *Thomas* case finding.

The evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, supported a jury conclusion that appellant secured entry into the Bobish residence by means of deception. Brooke Porter testified that appellant came to her home the afternoon before the murders and told her of his plan to go to the Bobish residence, knock on the door, tell Larry Sr. he had the money for the stolen drugs, and then kill Larry Sr. The jury was free to conclude that the plan appellant revealed to Porter was precisely how appellant gained entry, *i.e.,* by means of deception, which negated any purported license or privilege to enter. Accordingly, the evidence was sufficient to sustain appellant's conviction for burglary.

■■■■■ In an argument subsumed within his sufficiency claim, appellant also contends that the verdicts for first-degree murder and burglary were against the weight of the evidence. Although appellant cites to the standard for reviewing a weight claim, he does not forward an argument relating to the standard. Instead, the only argument forwarded, to the extent one is made at all, is the one summarized above respecting sufficiency. Thus, appellant does not say why, or in what respect, the verdict was against the weight of the evidence. In any event, as a general rule, a weight of the evidence claim is primarily addressed to the discretion of the judge who actually presided at trial. *Armbruster v. Horowitz*, 572 Pa. 1, 813 A.2d 698, 702 (2002). It is axiomatic that it is the function of the jury as the finder of fact to determine the credibility of the witnesses. *Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403, 408 (2003), *cert. denied*, 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004) (citing *Commonwealth v. Johnson*, 542 Pa. 384, 668 A.2d 97, 101 (1995), *cert. denied*, 519 U.S. 827, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996)). Thus, the trial judge possesses only narrow authority to upset a jury verdict on a weight of the evidence claim:

> A trial judge cannot grant a new trial "because of a mere conflict in testimony or because the trial judge on the same facts would have arrived at a different conclusion." [*Commonwealth v. Brown*, 538 Pa. 410, 648 A.2d 1177, 1189 (1994) ], quoting [*Thompson v. City of Philadelphia*, 507 Pa. 592, 493 A.2d 669, 672–73 (1985) ]. Instead, a new trial should be granted only in truly extraordinary circumstances, *i.e.*, "when the jury's verdict is *so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.*" *Id.* (emphasis in original).

*Armbruster*, 813 A.2d at 703.

The trial judge here denied appellant relief on his claim that the verdicts were against the weight of the evidence. Given the nature of the trial court's role in the trial proceedings and its unique vantage point vis-à-vis the testimony and evidence, "where the reasons for the trial court's granting or denying a

new trial appear in the record, this Court has held that only a palpable abuse of discretion will warrant upsetting that decision on appeal." *Id.* at 703. Appellant has failed to state whether he is challenging witness credibility or scientific evidence or some other error. We find no abuse of discretion here, where the record evidence as set forth in our discussion of the sufficiency of the evidence amply demonstrates that the trial court did not abuse its discretion in concluding that the verdicts were not against the weight of the evidence.

We turn now to appellant's eight claims of pretrial, guilt phase and penalty phase error, which we will address seriatim.

First, appellant argues that the suppression court erred in denying his omnibus pre-trial motion to suppress the oral and written statements he made to the investigating officers which, he claims, were obtained in a custodial interrogation which violated his constitutional right to counsel. Appellant was in an interview room with Trooper Marshall, Trooper Brian Mears and Corporal John Tobin. He claims that when he was first advised of his *Miranda* rights, and even though he signed a waiver of rights form, he spoke the word "attorney," at which point, Trooper Marshall asked if he wanted an attorney. When appellant responded in the affirmative, Trooper Marshall terminated the interview and left the room to speak to the District Attorney, who was present at the barracks at the time, while Corporal Tobin remained with appellant. Trooper Mears also left the room.

Appellant claims that at some point thereafter, Corporal Tobin initiated a conversation about God. As proof that it was Corporal Tobin who initiated the conversation, appellant cites to Trooper Marshall's written report of appellant's interrogation. Corporal Tobin, however, testified at the omnibus pretrial hearing that it was appellant who initiated the conversation, stating that he wanted to get his life together and make things right with God and himself. The suppression court, having "had the opportunity to hear and observe Corporal Tobin as he testified under oath, subject to cross-examina-

tion," found Corporal Tobin's testimony to be credible. *See* Suppression Ct. Op. at 11.

Indeed, the suppression court made the following factual findings, which are fully supported by this Court's review of the record. While in the interview room with Corporal Tobin, appellant began talking about the murders, but Corporal Tobin stopped him, stating that he could not talk to appellant unless he waived his right to counsel. Appellant told Corporal Tobin that he wanted to make things right by giving a statement. Again, Corporal Tobin told appellant that he had to wait for Trooper Marshall and Trooper Mears to return to the interview room and that he would have to waive his rights again. Corporal Tobin then left the room to find Trooper Marshall, and Trooper Mears entered the room and readvised appellant of his *Miranda* rights but did not take a statement from appellant. A short time later, Trooper Marshall and Corporal Tobin returned to the interview room where Trooper Marshall again advised appellant of his *Miranda* rights. Trooper Marshall read the waiver of rights form to appellant, who acknowledged that he understood his rights. Appellant then told Trooper Marshall that he had changed his mind, that he did not want an attorney, and that he wanted to make peace with God. Appellant subsequently gave written and oral statements implicating himself in the murders.

The law is well-settled that a defendant who requests counsel at any time during a custodial interview "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). In *Commonwealth v. Hubble,* 509 Pa. 497, 504 A.2d 168 (1986), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986), this Court held that a confession given after a defendant invokes his right to counsel need not be suppressed where the defendant: "(1) initiated 'further communication, exchanges, or conversations with the police', and (2) knowingly and intelligently waived the

right to counsel." *Id.* at 175 (quoting *Edwards*, 451 U.S. at 485–86 n. 9, 101 S.Ct. at 1885 n. 9).

Here, the suppression court found that, after invoking his right to counsel, which police respected, appellant initiated a conversation with Corporal Tobin, first stating that he wanted to make peace with himself and God and then indicating his desire to waive his right to counsel and make a statement regarding the murders. The suppression court determined that appellant "was not badgered by police officers to make a statement.... Instead, it was [appellant] who initiated further communication, exchanges or conversation with the police." Suppression Ct. Op. at 10. As a result, the suppression court concluded that "the subsequent interrogation by the police following [appellant's] assertion of his right to counsel does not require suppression of his statement." *Id.*[12]

 Our standard of review of suppression rulings is well-settled: this Court is bound by those of the suppression

---

**12.** Having determined that appellant initiated the subsequent conversation with the investigating officers, the suppression court turned to whether appellant knowingly, intelligently and voluntarily waived his right to remain silent and his right to counsel. Citing *Commonwealth v. Crosby*, 464 Pa. 337, 346 A.2d 768 (1975), the court considered the duration and methods of interrogation, the conditions of appellant's detention, the manifest attitude of the police toward appellant, appellant's physical and psychological state, and all other conditions present which might have served to drain appellant's powers of resistance to suggestion and undermine his self-determination. Applying these factors, the court found that: the entire interview process lasted slightly more than two hours, during twenty-six minutes of which appellant prepared a handwritten statement; appellant, who was nineteen years old and quit school in ninth grade, could read and write the English language; appellant was in good health and not impaired by alcohol or drugs; he was advised of the seriousness of the charges and the officers did not use threats or intimidation to secure the statement; he was advised of his *Miranda* rights three times, after which he acknowledged his understanding of the rights; and he signed two waiver of rights forms. Based upon the totality of the circumstances, the suppression court concluded that appellant knowingly, intelligently and voluntarily waived his rights to remain silent and to counsel. We note that appellant does not challenge these findings or this analysis; instead, his claim is limited to his preliminary contention that it was not he, but Corporal Tobin, who initiated the conversation after he initially invoked his right to counsel and that, in doing so, the Trooper violated his right to counsel.

court's factual findings which find support in the record, but we are not bound by the court's conclusions of law. *Commonwealth v. Millner*, 585 Pa. 237, 888 A.2d 680, 685 (2005) (citing *Commonwealth v. Templin*, 568 Pa. 306, 795 A.2d 959, 961 (2002)). Here, the suppression court's factual findings track the hearing testimony exactly and, therefore, they are amply supported by the record. Thus, we are bound by the court's findings. The suppression court did not err in refusing to suppress appellant's statements where he twice was advised of his rights and waived those rights and where the suppression court found that it was appellant who initiated a further conversation with Corporal Tobin after initially invoking his right to counsel.

Next, appellant purports to challenge the composition of the jury pool, on grounds that it did not contain a representative share of African–Americans. The requirements for establishing that a jury pool is not representative of the community population are as follows:

> To establish a violation of the requirement that the pool of prospective jurors is a fair representation of the community, "a defendant must show that: (1) the group allegedly excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such people in the community; and (3) this under[-]representation is due to systematic exclusion of the group in the jury selection process." *Commonwealth v. Craver*, 547 Pa. 17, 688 A.2d 691, 696 (1997), *cert. denied*, 522 U.S. 834, 118 S.Ct. 104, 139 L.Ed.2d 58 (1997) (quoting *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)). " 'Systematic' means caused by or inherent in the system by which juries were selected." *Id.* (quoting *Duren*, 439 U.S. at 366–367, 99 S.Ct. 664).

*Commonwealth v. Johnson*, 572 Pa. 283, 815 A.2d 563, 575 (2002).

The background for appellant's claim is as follows. Halfway through the second day of jury selection, when a pool of forty-

eight potential jurors remained for voir dire, appellant object-
ed because only two of the forty-eight jurors were African
American. Appellant argued that the pool was "not represen-
tative of the jury of blacks in Fayette County." N.T. 5/4/2004
at 156. The trial judge responded that counsel had the
opportunity to obtain the list of potential jurors in advance of
trial and object to its composition before jury selection began,
but nevertheless noted the objection. Appellant did not pur-
sue the matter further.[13]

Although appellant's statement of questions, his summary of
argument, and his argument heading all identify the issue as
whether the jury pool did not contain a representative share of
African–Americans, his limited argument alleges not that the
trial court's ruling on the merits of that claim was erroneous,
but that he was erroneously denied an opportunity to prove
the claim. Appellant cites the *Johnson* case and acknowl-
edges that he had the burden of proving this claim. Implicitly
conceding that he did not sustain his burden, however, appel-
lant states that, "[d]uring the choosing of the jury pool, [sic] it
became evident that there was not a representative share of
African–Americans," but that the "trial court cut off inquiry
into this subject." Appellant then concludes his argument
with the following summary complaint: "As seen from the
notes of transcript, counsel was not given time to place
testimony into evidence showing the above type of violation."
Brief for Appellant (citing N.T. 5/4/2004, at 156).

The Commonwealth responds by emphasizing appellant's
burden of actually proving systematic exclusion under *John-
son* and related cases, by noting that appellant does not have a
right to demand specific numbers of a particular group upon
venire panels, and that appellant made no showing that Fay-
ette County systematically excludes African–Americans from

13. This discussion occurred at sidebar about halfway through the
second day of jury selection. The first day of jury selection, May 3,
2004, began at 9:50 a.m. and ended at 4:50 p.m. The second day began
at 9 a.m. and concluded at 8:15 p.m. Appellant's objection was lodged
at about the midpoint of the second day, when approximately twelve of
the total of more than eighteen hours of jury selection had already
elapsed.

jury pools. In its opinion, the trial court reviewed the underlying merits of the claim, finding that appellant failed to produce any evidence that African–Americans are a distinctive group in Fayette County, that the representation of African–Americans in the pools from which juries are selected is not fair and reasonable in relation to the number of African–Americans in Fayette County, or that any alleged underrepresentation is the result of a systematic exclusion of African–Americans in the jury selection process. Neither the Commonwealth nor the trial court address appellant's current procedural complaint that he was denied an opportunity to prove his claim.

On this record, there is no question, nor even a dispute, that appellant failed to prove at trial that the jury pool was not a fair representation of the community. As to the procedural claim that appellant sketches on appeal, it appears that such complaint is waived because it was never raised as such in the court below. "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). In its opinion, the trial court meticulously listed the issues raised by appellant on appeal. The court's recitation states that appellant raised the issue of "Whether the defendant was prejudiced in that the jury pool did not include a representative share of African Americans in the pool." Appellant did not claim, either at trial or in his statement of matters complained of on appeal, that he was denied the opportunity to establish that the jury pool was not a fair representation of the community. Therefore, the challenge appellant now forwards is waived.[14]

Next, appellant argues that the trial prosecutor exercised a peremptory challenge to exclude a juror with "insufficient reason" under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). This claim fails.

*Batson* and its progeny restrict, through the Fourteenth Amendment's equal protection clause, the exercise of per-

14. We note that appellant makes no proffer as to what evidence of systematic exclusion he would have produced to sustain his burden of proof.

emptory challenges based on race in state trials in an attempt to eliminate purposeful racial discrimination in the jury selection process. The equal protection claim arising from peremptory challenges is the fact, explicitly recognized by the U.S. Supreme Court, that "peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Batson*, 476 U.S. at 96, 106 S.Ct. 1712. *Batson* set forth a three-part test for examining a criminal defendant's claim that a prosecutor exercised peremptory challenges in a racially discriminatory manner: first, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination. *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 728 (2000); *see also Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion); *Batson*, 476 U.S. at 97, 106 S.Ct. 1712.

*Commonwealth v. Harris*, 572 Pa. 489, 817 A.2d 1033, 1042–44 (2002), *cert. denied*, 540 U.S. 1081, 124 S.Ct. 939, 157 L.Ed.2d 756 (2003).

Appellant states that the juror at issue, Juror 293, was an African–American male who was pursuing a Master's Degree in social work at the California University of Pennsylvania, and who was working with troubled youths. After the juror expressed concern over the effect of jury service upon his impending graduation, appellant states, the prosecutor moved to excuse him for cause, and when that motion was denied, exercised a peremptory challenge. Without attempting to account for the applicability of *Batson's* three-part test, the reasons the prosecutor stated on the record for challenging the prospective juror, and the trial court's ruling or its discussion of the issue in its opinion, appellant then simply declares

that the prosecutor's reasons were "flimsy." Brief of Appellant at 15–16. Appellant thus never attempts to show how or why it is that the trial court committed legal error in ruling upon the *Batson* objection.

The Commonwealth responds by noting, first, that the record does not demonstrate that the juror was African–American; instead, the juror simply checked the category "other" on his jury questionnaire. The Commonwealth reviews the juror's testimony, noting that he expressed concern that he would be finishing his Master's degree program on Friday of the week scheduled for trial; that his last class was that Wednesday and he did not know what would happen if he missed it; that he worked as a counselor for troubled youth; that it would be nerve-racking to serve as a juror while wondering of the effect his service would have upon finishing his degree and participating in graduation; and that these concerns might affect his ability to give the case the attention it deserved. The Commonwealth relates that, in light of the juror's concerns, the prosecutor challenged him for cause, noting that she wanted jurors who would be able to listen attentively. Although the trial court denied that challenge, the Commonwealth notes that, after the prosecutor exercised a peremptory challenge, the trial judge in fact excused Juror 293 from further service on other cases given his concern over his impending situation. Finally, the Commonwealth notes that, when asked to state for the record the reason for her peremptory challenge, the prosecutor cited the pressure of school, the juror's probable inattention, and the fact that the juror worked as a youth counselor with persons close in age to appellant. In light of these facts, the Commonwealth argues, the trial court did not err in rejecting appellant's *Batson* claim. The Commonwealth, like appellant, never attempts to square its argument with the tripartite *Batson* test; thus, for example, it neither concedes nor disputes whether appellant proved a *prima facie* case under *Batson* with respect to this single peremptory challenge.

In its opinion, the trial court carefully reviewed (where the parties have not) *Batson's* analytical framework, noting, *inter*

*alia,* that when the inquiry proceeds past the *prima facie* stage and into the validity and race neutrality of a prosecutor's proffered explanations for a peremptory strike, the matter is often one of credibility and demeanor, an inquiry which rests "peculiarly within a trial judge's province." Trial court slip op. at 12–13. In explaining its ruling, the court did not state whether it found (and if so, why) that appellant had met his burden of proving a *prima facie* case, thus warranting a further direction that the prosecutor state the reasons for her strike on the record. Moreover, during voir dire, neither the court nor the parties discussed whether appellant had established a *prima facie* case. Instead, at a sidebar conference immediately following the prosecutor's exercise of her peremptory challenge, the prosecutor offered her reasons for challenging the prospective juror. Both at trial and in its opinion, the court either appeared to assume the existence of a *prima facie* case or simply omitted that step of the analysis and proceeded to analyze the prosecutor's explanation for the strike.[15] The trial judge found that the prosecutor's reasons for challenging the juror—specifically, her concerns that the juror would not be able to give the case his full attention in light of his anxiety over his impending graduation and plans— were race-neutral. The court further noted that the prosecutor examined this juror no differently than the Caucasian prospective jurors, and that it had not discerned any "racially disparate overtones in the prosecutor's demeanor during *voir dire*."

Since the Commonwealth does not dispute the existence of a *prima facie* case under *Batson,* and the trial court does not look to that part of the inquiry, we will proceed, as the parties have, to focus upon the trial court's finding that the prosecutor's explanations for the strike were race-neutral.[16] In *Har-*

---

15. The court states in its opinion that the juror was African–American, thus effectively negating the Commonwealth's first point on appeal.

16. *Harris* noted that the U.S. Supreme Court had suggested in its plurality opinion in *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), that " '[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination,

*ris,* this Court outlined the second and third prongs of the *Batson* test, including the prosecutor's obligation to put forward a race-neutral explanation and the court's role and discretion in making its determination as to discriminatory intent:

> The second prong of the *Batson* test, involving the prosecution's obligation to come forward with a race-neutral explanation of the challenges once a *prima facie* case is proven, "does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Rather, the issue at that stage " 'is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Id.,* quoting *Hernandez,* 500 U.S. at 360, 111 S.Ct. 1859.

> If a race-neutral explanation is tendered, the trial court must then proceed to the third prong of the test, *i.e.,* the ultimate determination of whether the opponent of the strike has carried his burden of proving purposeful discrimination. *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769. It is at this stage that the **persuasiveness** of the facially-neutral explanation proffered by the Commonwealth is relevant. *Id.* The trial court's finding as to discriminatory intent must of necessity be accorded great deference on appeal. This is so because the ultimate question of discriminatory intent involves an assessment of credibility. *Id.* at 769, 115 S.Ct. 1769; *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712.

the preliminary issue of whether the defendant had made a *prima facie* showing becomes moot.' " 817 A.2d at 509, quoting *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859. The *Harris* Court recognized that this point in *Hernandez,* being the expression of a plurality of Justices, did not require us to regard the preliminary question of a *prima facie* case as moot in such a circumstance. Nevertheless, we noted that the *Hernandez* plurality's expression was enough to "give us pause" and thus we turned to the question of whether the appellant had carried his burden of proving that the prosecution had struck the juror based on race, without first deciding whether appellant had presented a *prima facie* case of purposeful discrimination. We will take the same approach here.

In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province." *Hernandez*, 500 U.S. at 365, 111 S.Ct. 1859 (citations omitted). Accordingly, the trial court's finding as to discriminatory intent may be overturned only if it was clearly erroneous. *See Hernandez*, 500 U.S. at 363–70, 111 S.Ct. 1859.

*Harris*, 817 A.2d at 1043 (emphasis in original; footnote omitted).

The record here supports the characterization of the hearing below as forwarded by the trial court and the Commonwealth.[17] Further, our review of the record confirms the trial judge's conclusion that the prosecutor's questions to Juror 293 mirrored those she posed to other prospective jurors. Further, Juror 293 clearly expressed his reluctance to serve due to his remaining Master's class and his pending graduation. We agree with the trial court that the prosecutor was clearly concerned with the juror's reluctance and that this is a race-

---

17. The prosecutor set forth the reasons for her challenge in a clear and concise manner:

> Your Honor, I have a mutual [sic] explanation for challenging the juror as the court has heard the perspective [sic] juror has stated that he has a final class in an area of his knowledge on Wednesday at 3:00 o'clock. In fact he has that class and it's scary and also he graduates and he does not know whether his failure to attend would result in him being able to graduate. That those issues would be on his mind and perhaps his attention wouldn't appear [sic] on the trial in this issue. That was one of the reasons that I peremptorily challenged this perspective [sic] juror.
>
> The other reason is that the defendant [sic] is working with individuals of the age of twelve to eighteen and the defendant being nineteen at the time this matter occurred. I would not want any problems with the fact that this juror deals with troubled youth and obviously very closely in age with people that he counsels and treats. For purposes of this selection I would not want that person as a juror.

N.T. 5/3/2004 at 149–50.

neutral basis for striking him. Finally, the prosecutor's second reason, the nature of the juror's work with troubled teens close to appellant's age, is also race-neutral. The trial judge was able to observe the prosecutor's demeanor as she questioned Juror 293 and as she stated her reasons for exercising a peremptory challenge and concluded that her reasons for striking Juror 293 were race-neutral. This exercise of the trial court's discretion was not clearly erroneous. Thus, appellant has failed to establish that the trial court erred in rejecting his *Batson* claim.

Appellant next argues, in summary fashion, that the court erred in admitting into evidence Exhibits 25 and 26. Although appellant does not specifically identify what the exhibits were, the record reveals that Exhibit 25 was a wooden knife handle found by Trooper Large on the living room floor of the Bobish home, and Exhibit 26 was a serrated-edge knife blade also found in the living room. Appellant claims that the exhibits "had no relevance," "could not be linked to the charges," and that their prejudicial effect outweighed any probative value. In appellant's view, the exhibits were irrelevant because there was no reason to believe they were parts of the knife which he used to assault Larry, Jr., and they were "highly prejudicial," although he never explains why that is so.

The Commonwealth states that, while sifting through the debris of the Bobish home, the fire marshal found a serrated knife blade and photographed it.[18] Citing *Commonwealth v. Clark*, 280 Pa.Super. 1, 421 A.2d 374 (1980), the Commonwealth argues that all that is required for a weapon to be introduced into evidence "is a sufficient foundation revealing circumstances justifying an inference or likelihood that a weapon was used in the course of the crime charged." Brief of Appellee at 13. The Commonwealth contends that a proper foundation was laid in this case, the trial court admitted the

18. The Commonwealth apparently believes, mistakenly, that Exhibits 25 and 26 are photographs of the serrated knife blade. The record, however, clearly reflects that the exhibits are the wooden handle of a knife and the serrated blade, respectively.

evidence in its sound discretion, and the issue then becomes a jury question as to the weight of the evidence.

The trial court stated in its opinion that the evidence was admitted, over appellant's objection, because Larry Jr. testified that appellant cut his throat in the living room of the Bobish home, and Trooper Large testified that he found the wooden knife handle on the living room floor. The trial transcript reveals that Trooper Large also found the serrated blade in the living room. N.T. 5/5/04 at 117. The trial court found that the exhibits constituted evidence that bore upon a matter at issue in the case and were relevant to prove that appellant cut Larry Jr.'s throat.

 The admission of evidence is a matter committed to the sound discretion of the trial court, and the court's evidentiary decisions will not be overturned absent an abuse of discretion. *E.g. Commonwealth v. Tharp*, 574 Pa. 202, 830 A.2d 519, 530 (2003), *cert. denied*, 541 U.S. 1045, 124 S.Ct. 2161, 158 L.Ed.2d 736 (2004). Evidence is admissible if it is relevant to a determination of guilt or innocence, and if the probative value of the evidence outweighs any unfair prejudicial effect. *Id.* (citing *Commonwealth v. Strong*, 522 Pa. 445, 563 A.2d 479 (1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1536, 108 L.Ed.2d 775 (1990); *Commonwealth v. Green*, 488 Pa. 611, 413 A.2d 651, 654 n. 2 (1980)); *see also* Pa.R.E. 403. Evidence is relevant "if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Tharp*, 830 A.2d at 530 (quoting *Commonwealth v. Stallworth*, 566 Pa. 349, 781 A.2d 110, 117 (2001)).

 This Court has long held that the prosecution need not establish that a particular weapon was actually used in the commission of a crime in order for it to be admissible at trial. *Commonwealth v. Lee*, 541 Pa. 260, 662 A.2d 645, 652 (1995), *cert. denied*, 517 U.S. 1211, 116 S.Ct. 1831, 134 L.Ed.2d 935 (1996) (citing *Commonwealth v. Thomas*, 522 Pa. 256, 561 A.2d 699 (1989); *Commonwealth v. Clayton*, 516 Pa. 263, 532 A.2d

385 (1987), *cert. denied,* 485 U.S. 929, 108 S.Ct. 1098, 99 L.Ed.2d 261 (1988); *Commonwealth v. Brown,* 467 Pa. 512, 359 A.2d 393 (1976); *Commonwealth v. Yount,* 455 Pa. 303, 314 A.2d 242 (1974); and *Commonwealth v. Ford,* 451 Pa. 81, 301 A.2d 856 (1973)). Further, the Commonwealth need only lay a foundation that would justify an inference by the finder of fact of the likelihood that the weapon was used in the commission of the crime. *Id.* (citing *Thomas,* 561 A.2d at 707).

In the case *sub judice,* before these exhibits were offered into evidence at trial, Larry Jr. had testified that appellant cut his throat with a knife in the living room. Trooper Large then testified that he found the wooden knife handle and the serrated blade on the living room floor of the Bobish home. The trial court did not err in admitting the knife handle and blade because a proper foundation was laid through the testimony of Larry Jr. and Trooper Large and because it justified an inference by the jury that appellant used the knife to cut Larry Jr.'s throat. Moreover, because appellant has not articulated how the admission of these relevant exhibits was unduly prejudicial, his claim fails.

Next, appellant claims that the trial court erred in admitting testimony which established a prior drug relationship between Larry Sr. and appellant. Appellant notes that this evidence was introduced through the testimony of appellant's friend, Brooke Porter, who said that appellant told her he had robbed Larry Sr. on the Friday evening before the murders. Appellant argues that Porter's testimony was inadmissible hearsay because it was premised only upon appellant's out-of-court statements, and appellant's statements did not go to his state of mind. Citing without explanation to the Superior Court's decision in *Commonwealth v. Ramos,* 366 Pa.Super. 624, 532 A.2d 22 (1987), appellant also argues that the evidence of the drug relationship was irrelevant. Finally, and equally summarily, appellant declares that the prejudicial effect of the testimony outweighed its probative value.

The Commonwealth responds that the evidence of appellant's prior robbery of drugs from Larry Sr. was an admissible

prior bad act because it was not used to prove criminal propensity, but rather, was probative of motive, intent, absence of mistake or accident, a common scheme, plan or design, or to prove identity. The trial court deemed the evidence to be admissible because: it provided circumstantial evidence of appellant's state of mind; it constituted evidence that bore upon a matter at issue in this case, *i.e.*, whether appellant had formed the specific intent to kill the Bobish family; and it was relevant to the inference that appellant had a motive and opportunity to commit the crimes.

The obvious short answer to appellant's hearsay claim, albeit it is not the answer proffered by the Commonwealth or the trial court, is that appellant's out of court statement was an admission by a party-opponent, which is a settled exception to the hearsay rule. *See* Pa.R.E. 803(25).[19] Party admissions are not subject to hearsay exclusion because:

it is fair in an adversary system that a party's prior statements be used against him if they are inconsistent with his position at trial. In addition, a party can hardly complain of his inability to cross-examine himself. A party can put himself on the stand and explain or contradict his former statements.

*Commonwealth v. Chmiel,* 558 Pa. 478, 738 A.2d 406, 420 (1999), *cert. denied,* 528 U.S. 1131, 120 S.Ct. 970, 145 L.Ed.2d 841(2000) (citing Packel & Poulin, *Pennsylvania Evidence* § 805 (1987)). Thus, in criminal cases, this Court has consistently held that a defendant's out-of-court statements are party admissions and are exceptions to the hearsay rule. *See id.; Commonwealth v. Paddy,* 569 Pa. 47, 800 A.2d 294, 312 n. 11 (2002); *Commonwealth v. Laich,* 566 Pa. 19, 777 A.2d 1057, 1060 (2001).[20]

19. It is settled that we may affirm a trial court's evidentiary ruling if we deem it to have been correct on grounds other than those specified by the court itself, particularly where the additional reason is apparent from the record. *See, e.g., Commonwealth v. Mitchell,* 576 Pa. 258, 839 A.2d 202, 215 n. 11 (2003); *C.B. ex rel. R.R.M. v. Commonwealth, Dept. of Public Welfare,* 567 Pa. 141, 786 A.2d 176, 178 n. 1 (2001); *Commonwealth v. Meyer,* 488 Pa. 297, 412 A.2d 517, 522 n. 12 (1980).

20. The Pennsylvania Rules of Evidence follow the common law and list party admissions as an "exception" to the hearsay rule. The Federal

Here, Porter testified that appellant admitted to her that he had robbed Larry Sr. This is clearly a party admission. Moreover, in fact appellant had ample opportunity to dispute Porter's testimony of what he said out-of-court since he testified on his own behalf. The account of appellant's out-of-court statements plainly was relevant because it exposed appellant's motive in going to the Bobish home and confronting Larry Sr., and, to the extent it revealed appellant's planning of the murders, it was relevant to prove deliberation and premeditation. Finally, appellant has not articulated how the probative value of the evidence was outweighed by any unfair prejudice. On such a record, we see no reversible error in the trial court's admission of the testimony. *See Tharp*, 830 A.2d at 530.

Appellant next contends that the trial court erred in admitting his confession to Porter concerning the Friday night robbery of Larry Sr. before the Commonwealth had proved the *corpus delicti* of that crime, citing *Commonwealth v. Reyes*, 545 Pa. 374, 681 A.2d 724 (1996), *cert. denied* 520 U.S. 1174, 117 S.Ct. 1445, 137 L.Ed.2d 551 (1997). Appellant claims that, at the time Porter testified about the robbery, the Commonwealth had not yet established that appellant killed the Bobish family members. Appellant is correct that this Court's decision in *Reyes* holds that, "[b]efore introducing an extra-judicial admission, the Commonwealth must establish by independent evidence that a crime has in fact been committed." *Id.* at 727. The *corpus delicti* rule, however, is inapplicable to the evidence appellant challenges here. "The purpose of the corpus delicti rule is to guard against 'the hasty and unguarded character which is often attached to confessions and admissions and the consequent danger of a conviction where no crime has in fact been committed.'" *Id.* (citing *Commonwealth v. Turza*, 340 Pa. 128, 16 A.2d 401, 404 (1940)). Here, appellant's confession to Porter was not to the murders

Rules of Evidence exclude party admissions from the definition of hearsay itself and list the exception in F.R.E. 801. This organizational difference has no material affect on the substantive application of the rules. *See* Pa.R.E. 803(25), Comment.

and other offenses with which he was charged, but rather concerned an uncharged robbery that occurred prior to the crimes at issue. In an instance such as that presented *sub judice,* there was no possibility that appellant's confession would lead to his conviction for an earlier robbery with which he was not charged, and thus the purpose of the *corpus delicti* rule is not implicated.

In any event, even if the rule had some applicability in this instance, as the Commonwealth counters, Larry Jr. testified before Porter did, and his testimony clearly established that appellant was admitted to the Bobish home and then killed Larry Sr., Joanna and Krystal, shot and stabbed Larry Jr. and then set the house on fire. In addition, prior to Porter's testimony, the jury heard the testimony of Corporal Andre Stevens, who was the first officer on the scene, Aaron Coleman, the Bobishes' neighbor, Trooper William Large, who investigated the scene, and Dr. Cyril Wecht, the coroner who testified regarding the autopsies. All of this testimony established that the charged crimes had been committed. Finally, we note that the order in which evidence is presented is a matter committed to the trial court's discretion, and its rulings will not be disturbed absent an abuse of that discretion. *Commonwealth v. Jones,* 539 Pa. 222, 651 A.2d 1101, 1106 (1994), *cert. denied,* 516 U.S. 835, 116 S.Ct. 113, 133 L.Ed.2d 65(1995) (citing *Commonwealth v. Smallwood,* 497 Pa. 476, 442 A.2d 222 (1982); *Commonwealth v. Hickman,* 453 Pa. 427, 309 A.2d 564 (1973)). Appellant has not proven an abuse of discretion here.

Appellant's final two claims of error arise out of the penalty phase of his trial. First, he argues that the trial court erred when it permitted the Commonwealth to proceed on the 42 Pa.C.S. § 9711(d)(11) aggravating circumstance, which provides as follows: "The defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue." Appellant notes that the language in the Commonwealth's Notice of Aggravating Circumstances did not conform to the statutory language

and did not cite to the correct subsection of the statute relating to multiple deaths.

The Commonwealth filed a single Notice of Aggravating Circumstances pertaining to all three first degree murder charges on July 17, 2002. The notice stated, in pertinent part: "(1) the offense was committed by means of multiple shootings causing multiple deaths, including the death of an unborn child, the defendant knowing that the victim was pregnant. 42 Pa.C.S. § 9711(d)(17)." The (d)(17) aggravating circumstance provides that: "At the time of the killing, the victim was in her third trimester of pregnancy or the defendant had knowledge of the victim's pregnancy," and thus, this circumstance was relevant only to the charge involving the murder of Krystal Bobish.

Appellant demurred to the Commonwealth's Notice of Aggravating Circumstances, asking that all of the aggravating circumstances be dismissed because the Commonwealth's notice was vague. The trial court held a hearing on May 10, 2004, prior to the commencement of the penalty phase of appellant's trial, to rule on the demurrer. Specific to the issue of multiple deaths under Section 9711(d)(11), appellant claimed that the notice, by combining in a single sentence multiple deaths with the death of an unborn child, and by failing to cite to Section 9711(d)(11), did not provide him with notice that the Commonwealth intended to proceed on the Section 9711(d)(11) aggravator. At the May 10th hearing, the trial court held that appellant had constructive notice that the Commonwealth intended to proceed on that aggravating circumstance, given that appellant was charged with three murders and the notice referred to multiple deaths. In any event, the court allowed the Commonwealth to amend its notice to specifically set forth the Section 9711(d)(11) aggravating circumstance.

On appeal, appellant challenges the propriety of the trial court allowing the prosecution to present the (d)(11) aggravating circumstance. Citing to Rule 802 (formerly Rule 352) of the Rules of Criminal Procedure,[21] appellant argues that the

21. Appellant, the trial court and the Commonwealth all erroneously refer to the pertinent rule as Rule 801 when it is actually Rule 802.

Commonwealth was required to set forth the aggravating circumstances in language substantially tracking that found in the statute, but failed to do so. Rule 802 requires that, in a case where it intends to seek the death penalty, the Commonwealth must file a "Notice of Aggravating Circumstances that the Commonwealth intends to submit at the sentencing hearing" and to provide the defendant with a copy of the notice. In forwarding his argument, appellant relies upon the language of the Comment to Rule 802, which states: "For purposes of this rule, the notice requirement is satisfied if the copy of the notice to the defendant sets forth the existing aggravating circumstances substantially in the language of the statute." Here, appellant argues, the notice did not conform to the language of the statute; the Commonwealth did not move promptly to amend the notice; and at no time prior to trial did the Commonwealth state to the defense that it intended to pursue the (d)(11) aggravating circumstance. Appellant acknowledges that the trial court deemed the Commonwealth's notice to be sufficient to put the defense on constructive notice respecting the multiple murder aggravator but, he argues, constructive notice should not be deemed sufficient in a death penalty case, and defense counsel should not have to anticipate, or guess at, the aggravating circumstances the prosecution intends to pursue. Appellant argues that where, as here, there is no good cause shown for the Commonwealth's lapse, the Commonwealth should be "sanctioned" by not being permitted to pursue the aggravating circumstance.

The Commonwealth responds by noting that the intent of Rule 802 is to give the defense sufficient time and information to prepare for the penalty hearing. The Commonwealth further notes that, although its notice did not cite to (d)(11), it did include language referring to multiple deaths. In these circumstances, the Commonwealth argues, the trial court was correct in determining that appellant had adequate notice and that he was not prejudiced. In support of its argument, the Commonwealth cites *Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395 (1994), for the proposition that a defendant has

constructive notice where the charges alone state the aggravating circumstances. Here, the Commonwealth argues, the notice not only mentions the aggravating circumstance of multiple murders, but the charges speak of three deaths plus the death of an unborn child.

The trial court found that appellant was "correct" that the Commonwealth did not properly cite to the subsection of the death penalty statute governing multiple deaths. But, the court noted, the intention of the Rule is simply "to 'give the defendant sufficient time and information to prepare for the sentencing hearing.'" Tr. Ct. Op. at 25 (quoting *Commonwealth v. Carson*, 559 Pa. 460, 741 A.2d 686 (1999), *cert. denied*, 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000)). The court then found that appellant had "ample notice" that the Commonwealth intended to proceed on the multiple murders aggravator, even if the Commonwealth did not parrot the exact language of the statute or cite to the subsection referring to multiple murders, because the notice specifically said that the "offense was committed by means of multiple shootings causing multiple deaths." The court then went on to distinguish this Court's decision in *Commonwealth v. Williams*, 539 Pa. 61, 650 A.2d 420 (1994), by noting that in that case, this Court determined that the Commonwealth could not amend its notice to include a new aggravating circumstance one year after the arraignment. Here, by contrast, the trial court found that the Commonwealth did not seek to include a new aggravating circumstance but rather simply referred to the incorrect numerical subsection while paraphrasing the wording of the appropriate subsection. Thus, the trial court found no prejudice to appellant occasioned by the Commonwealth's failure to cite to the proper subsection, given that appellant had constructive notice of the Commonwealth's intention to pursue the (d)(11) aggravator.

This Court has spoken to the issue of compliance by the Commonwealth with Rule 802 and its predecessor Rule 352 in a series of cases. The decisions reveal a central theme: where the defendant has constructive notice of the aggravators due to the crimes charged, we have found no prejudice

resulting from the Commonwealth's failure to provide timely or accurate notice. For example, the case the Commonwealth cites, *Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395 (1994), involved the murders of two hikers on the Appalachian Trail. The Commonwealth notified the defendant that it intended to seek the death penalty but failed to give notice pursuant to then-Rule 352 by the time of the defendant's arraignment, instead giving the required notice just three days before trial commenced. The defendant claimed that the failure to provide notice denied him a fair trial. The Commonwealth responded that the defendant was at all times aware of the potential aggravating circumstances, and was not prejudiced in any way by the failure to receive specific written notice of the relevant aggravating circumstances because they were inherent in the charges against the defendant. As to the male victim in the case, the Commonwealth pursued the aggravating circumstances that the murder was committed during the perpetration of a felony (robbery), multiple homicides, and endangering another; as to the female victim, the Commonwealth pursued the aggravating circumstances that the murder was committed during the perpetration of a felony (rape), multiple homicides and torture.

The trial court concluded that the defendant was aware of the potential aggravating circumstances, with the exception of torture, which was unknown to the Commonwealth at the time of the defendant's arraignment, and that he was not prejudiced by the Commonwealth's failure to provide notice. This Court agreed that the aggravators were inherent in the crimes charged, thus giving the defendant constructive notice of the potential aggravating circumstances and, therefore, no prejudice resulted from the absence of written notice.

This Court visited the issue again in *Commonwealth v. Abdul–Salaam*, 544 Pa. 514, 678 A.2d 342 (1996), *cert. denied*, 520 U.S. 1157, 117 S.Ct. 1337, 137 L.Ed.2d 496 (1997), where the Commonwealth provided notice to the defendant one month after his arraignment. We held that the defendant suffered no prejudice as a result of the late notice because he still had more than three months in which to prepare his

penalty defense. In a case more analogous to the case *sub judice, Carson,* 741 A.2d 686, the Commonwealth was permitted to proceed on an aggravating circumstance it had omitted from its notice to the defendant. There, two months after arraignment but at least five months before trial, the defendant was charged with the additional offenses of robbery and aggravated assault. This Court held that the charges of robbery and aggravated assault made it apparent to the defense that the Commonwealth was proceeding on the aggravating circumstance of other felony offenses committed in conjunction with the murder. Furthermore, the defense had ample time to prepare to challenge the aggravating circumstance at the sentencing hearing; therefore, the defendant was deemed to have suffered no prejudice from the absence of formal notice of that aggravating circumstance.

By contrast, at least where the aggravating circumstance is not apparent from the charges filed against a defendant, this Court has determined that the defendant has suffered prejudice from an absence of notice and has ordered a new sentencing hearing. *See Commonwealth v. Williams,* 539 Pa. 61, 650 A.2d 420 (1994) (defendant who was notified two days into jury selection of aggravator of significant history of felony convictions deemed to have suffered prejudice); *Commonwealth v. Wesley,* 562 Pa. 7, 753 A.2d 204 (2000) (Commonwealth aware of torture aggravator before arraignment but failed to notify defendant, resulting in prejudice to defendant). Clearly, a significant history of felony convictions and torture are not circumstances that are inherent in the specific crimes charged and, therefore, the failure to provide notice of an intent to pursue those aggravating circumstances properly mandates a different result: a defendant who is not given specific notice of those aggravators can be prejudiced by a lack of time to prepare a defense.

The case *sub judice* falls squarely into the first category of decisions, where the aggravating circumstances are inherent in the crimes charged. Appellant was well aware that he was facing multiple murder charges. Thus, any failure on the part of the prosecution to notify appellant of its intent

to pursue the (d)(11) aggravator, or any defect in the notice provided, cannot be said to have prejudiced him. Indeed, it is difficult to see how a defect in notice concerning this aggravator could prejudice the defense ability to attempt to rebut the circumstance, and appellant does not articulate any specific prejudice he suffered. Further, the prosecution did not fail to provide notice here, but rather provided imprecise notice. Finally, our decisions in this area have vested in the trial courts considerable discretion to determine what sanctions, if any, are appropriate due to defective notice, and we see no abuse of discretion in the circumstances here. The purpose of Rule 802, as noted by the trial court, is to provide a defendant with sufficient time and information to prepare a defense. There is no question that the notice in this case lacked the specificity envisioned by Rule 802, and the Commonwealth offered no valid explanation for its lapse. Nevertheless, the charges and the notice provided gave appellant sufficient time and information to prepare his defense against the (d)(11) aggravator, as he was well aware that he was charged with multiple murders.

Having said this, however, we must stress that we do not condone the Commonwealth's providing imprecise notice, or failing to provide notice at all, of aggravating circumstances. Specificity in such notices obviously is desirable, and this requirement does not impose an onerous burden on the Commonwealth. The statute lists very precise, specific and distinct aggravators, and the Commonwealth should endeavor to match that precision in providing notice to capital defendants.

■ Appellant's final claim also relates to the sufficiency of the Notice of Aggravating Circumstances, and indeed involves the same sentence in that Notice as the prior claim, but concerns the Section 9711(d)(17) aggravator, which applied only to the murder of Krystal. The (d)(17) aggravating circumstance involves the death of an unborn child where the defendant knew the victim was pregnant or the victim is in her third trimester of pregnancy.[22]

22. We note preliminarily that, because this aggravating circumstance applied only to Krystal, even if appellant prevailed and we were to

192

Again citing to Criminal Rule 802, appellant argues that the trial court erred in permitting the Commonwealth to proceed on the aggravating circumstance relating to the death of Krystal's unborn child because the notice did not "substantially follow the statute as required." The Commonwealth's notice stated that: "(1) The offense was committed by means of multiple shootings and causing multiple deaths, including the death of an unborn child, the defendant knowing that the victim was pregnant." Appellant's challenge focuses on the Commonwealth's failure to include the language of (d)(17) which states that the victim was in her third trimester of pregnancy. Because the notice lacked that language, appellant claims that he was only given notice to defend against the portion of (d)(17) involving a defendant's knowledge that the victim was pregnant. Appellant argues that there was no evidence presented that appellant was aware of Krystal's pregnancy, and it was only after the guilt phase concluded and before the penalty phase commenced that appellant became aware that the Commonwealth intended to proceed on the alternate theory that Krystal was in her third trimester of pregnancy. Appellant then reiterates his argument related to the (d)(11) aggravator—*i.e.,* that the Commonwealth should be held to the notice provided to appellant.

The Commonwealth counters that this is an argument of form over substance because appellant had actual and constructive notice that the Commonwealth was proceeding on the aggravator involving the death of an unborn child. According to the Commonwealth, Larry Jr. testified that his sister was visibly pregnant, and the coroner, Cyril Wecht, estimated the gestational age of the baby at twenty-eight weeks. The Commonwealth again argues that the (d)(17) aggravator is inherent in the charges against appellant, which included the death of Krystal's unborn baby. Citing to *Carson,* the Commonwealth notes that, in that case, this Court allowed the Commonwealth to proceed on an aggravating

overturn his death sentence as to Krystal, that decision would not affect the validity of the death sentences relating to the murders of Larry Sr. and Joanna.

circumstance that was omitted entirely from its notice because the charges filed provided the defendant with constructive notice of the aggravator. Here, by contrast, appellant was actually provided with notice that the Commonwealth intended to pursue the (d)(17) aggravator, and the charges against him included a murder charge arising from the death of the unborn child.

The trial court found that, although the Commonwealth's notice did not reference the first clause of (d)(17) relating to a victim who is in the third trimester of pregnancy, appellant had actual notice that the Commonwealth intended to pursue the (d)(17) aggravator. The court further concluded that the Commonwealth's notice was sufficient to provide appellant with constructive notice of the Commonwealth's intent with regard to that aggravator. We agree with the trial court that the Commonwealth provided appellant with actual notice of its intent to proceed under (d)(17) generally, and, at the very least, constructive notice that the Commonwealth intended to pursue the first part of the aggravating circumstance involving a victim in her third trimester. Furthermore, as the Commonwealth notes, the coroner's testimony clearly established that Krystal was in the third trimester of her pregnancy, and other evidence established that she was visibly pregnant. Additionally, appellant was charged at the outset with the death of Krystal's unborn child. On this record, we are satisfied that appellant was not prejudiced by the notice given, and that the trial court did not abuse its discretion in rejecting this claim.

 Having concluded that appellant is not entitled to relief on any of the claims that he raises, we turn to the independent penalty review mandated by 42 Pa.C.S. § 9711(h)(3), which directs this Court to affirm the sentences of death unless we determine that: (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in Section 9711(d). This case involves three death sentences arising out of three murders, and therefore, we have reviewed each of the

sentences relating to the three separate murders. Our review of the record establishes that the sentences of death imposed upon appellant in each case were not the product of passion, prejudice, or any other arbitrary factor. In addition, we find that the evidence presented in each case was sufficient to support the jury's finding of two aggravating circumstances as to all three victims—appellant knowingly created a grave risk of death to another person in addition to the victim (42 Pa.C.S. § 9711(d)(7)) and appellant was convicted of another murder committed at the time of the offense at issue (42 Pa.C.S. § 9711(d)(11)), and the additional aggravating circumstance relating only to Krystal—that the victim was in her third trimester of pregnancy or appellant knew she was pregnant (42 Pa.C.S. § 9711(d)(17)). Thus, there is no statutory basis upon which this Court could, of its own accord, disturb the sentences of death.

For the foregoing reasons, we affirm the verdict, the sentences of death, and the lesser sentences imposed.[23]

Chief Justice CAPPY and Justices NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN join the opinion.

---

23. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).