**Commonwealth v. Lawrence**

C.P. of Lancaster County, no. 5131-2006.

*Susan Mover, assistant district attorney,* for Commonwealth.
*MaryJean Glick, senior assistant public defender,* for defendant.

ASHWORTH, *J.,* November 3, 2008—Alvin Earl Lawrence has filed a direct appeal to the Superior Court of Pennsylvania from his judgment of sentence entered on August 22, 2008, as finalized by this court's denial of his post-sentence motions on September 3, 2008. This opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.

## I. BACKGROUND

At the conclusion of a jury trial on May 9, 2008, appellant Lawrence was found guilty of delivery of a controlled substance in a school zone.[1] The basis for appellant's conviction was a hand-to-hand cocaine sale to an undercover Lancaster City police officer on September 20, 2006.

On August 22, 2008, appellant was sentenced to a period of incarceration of 33 to 76 months in a state correctional institution. Appellant filed post-sentence motions, specifically a motion to modify sentence and a

---

1. 35 Pa.C.S. §780-113(A)(30).

motion to vacate jury verdict as against the weight of the evidence. These motions were denied by order of September 3, 2008. A timely appeal to the Superior Court of Pennsylvania was filed on October 2, 2008.

Pursuant to this court's directive, appellant furnished a statement of matters complained of on appeal which raises just one issue: whether the verdict was against the weight of the evidence.

## II. DISCUSSION

Appellant solely raises a weight of the evidence challenge. Appellant claims the jury's verdict of guilty of delivery of cocaine was so unreliable as to shock one's sense of justice. (See appellant's 1925(b) statement at ¶1.) A claim that the verdict is contrary to the weight of the evidence "concedes that there is sufficient evidence [to sustain the verdict], but nevertheless contends that the trial judge should find the verdict so shocking to one's sense of justice and contrary to the evidence as to make the award of a new trial imperative." *Commonwealth v. Robinson,* 834 A.2d 1160, 1167 (Pa. Super. 2003). See also, *Commonwealth v. Lewis,* 911 A.2d 558, 566 (Pa. Super. 2006). Our Supreme Court has summarized the standard to be applied in addressing a "weight of the evidence" issue:

"The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. . . . An appellate court cannot substitute its judgment for that of the finder of fact. . . . Thus, we may only reverse the lower court's verdict if it is so contrary to the

evidence as to shock one's sense of justice." *Commonwealth v. Champney,* 574 Pa. 435, 444, 832 A.2d 403, 408 (2003). (citations omitted)

The Commonwealth's evidence presented at the trial in this matter can be summarized as follows. On September 20, 2006, Office Garrett Lowe, with the Selective Enforcement Unit in the Lancaster City Bureau of Police, was supervising a buy-bust detail operation[2] in the City of Lancaster. (Notes of testimony, trial (N.T.T.) at 37, 39-42.) Officer Willard Smith and Officer Hyson were the undercover officers whose role it was to go into the high drug areas of the city and try to buy controlled substances from drug dealers. (*Id.* at 44, 46.)

Officer Smith testified that on September 20, 2006, he and Officer Hyson parked their vehicle at the intersection of New Dorwart Street and Manor Street in the southwest area of the city. (N.T.T. at 48.) Officer Smith, who was seated in the passenger side of the car, spoke to a black male, whom he identified at trial as appellant, as he approached the vehicle. (*Id.* at 48, 55-56.) Officer Smith said he was interested in buying $20 worth of crack

---

2. In a typical "buy-bust" operation, the Selective Enforcement Unit selects target locations in the City of Lancaster that are identified as drug dealing areas. (N.T.T. at 97-98.) Undercover officers are sent into these areas to make purchases of controlled substances at the street level. (*Id.* at 97.) A surveillance team is responsible for coordinating the actions of the undercover officers, as well as coordinating the arrest with the several arrest teams that are involved in the "buy-bust" detail. The "buy money" is proceeds from other drug investigations by the Lancaster County Drug Task Force. (*Id.* at 98-99.) The surveillance officer is responsible for photocopying the money before it is used in a drug purchase. (*Id.* at 99.) The arresting officers then confirm the presence of the buy money by checking the serial number. (*Id.*)

cocaine. (*Id.* at 49.) Appellant said he would be right back, crossed the street and entered a store on the corner. (*Id.*) When appellant returned to the vehicle, he handed Officer Smith a .2 gram bag of crack cocaine and Officer Smith handed appellant a marked $20 bill. (*Id.*) Appellant walked back toward the corner store. (*Id.* at 54.)

Officer Smith identified appellant as wearing a black baseball cap with an insignia on it, a black zip-up sweat-shirt that was tied, a white t-shirt and blue jean denim "knickerbocker" shorts to his ankles. (N.T.T. at 52, 64, 68.) After the completion of the drug deal, Officer Hyson called the surveillance team and provided a description of appellant. (*Id.* at 53-54.) There was sufficient artificial lighting to clearly see appellant who was standing less than three feet from Officer Smith. (*Id.* at 54-55.) The officers then left the area and the surveillance team moved in and made the arrest of appellant. (*Id.* at 59.) Within minutes, Officers Smith and Hyson were called back to the area to identify the suspect, which they did. (*Id.* at 60.) Officer Smith positively identified appellant at trial as the individual in the arrest photos taken of appellant that same night. (*Id.* at 58; Commonwealth exhibit no. 2.)

The next witness for the Commonwealth was Officer Stanley Roache, a member of the Street Operation Group, who was assisting Officers Smith and Hyson with the drug detail on September 20, 2006. (N.T.T. at 84-86.) Office Roache testified that after receiving a "good deal sign" from the surveillance officer, Detective Rowland Breault, he and his partner drove to the intersection of Manor and Dorwart Streets and observed the subject, identified at time of trial as appellant, exiting the corner

store. (*Id.* at 87.) They immediately took the subject into custody. (*Id.* at 87-88.) A search of appellant did not reveal the buy money so Officer Roache entered the corner store, which was unoccupied except for the store clerk, and found the marked $20 bill in the cash register. (*Id.* at 90-92.) Officer Roache positively identified appellant as the individual in the arrest photographs marked as Commonwealth exhibit no. 2. (*Id.* at 89, 94.)

Detective Breault identified Commonwealth exhibit no. 5 as a photocopy of a $20 bill made by him just prior to the drug detail on September 20, 2006. (N.T.T. at 99-100.) The serial number on the $20 bill retrieved from the corner store by Officer Roache matched the serial number on the photocopy of the money made by Detective Breault. (*Id.* at 106-107; see Commonwealth exhibit no. 4.)

Appellant took the stand in his own defense at trial. He testified that after playing video games with his friend, Quentin Murray, he left for home between 11:15 and 11:25 p.m. (N.T.T. at 143.) Appellant stopped in the corner store at Dorwart and Manor Streets to buy a 25¢ drink and a 25¢ cake with the 50¢ in his pocket. (*Id.* at 144, 151-52.) When he exited the store, he was surrounded by police and arrested. (*Id.* at 145.) He denied talking to the police, selling them drugs and giving the clerk in the corner store a $20 bill. (*Id.* at 143-44.) Appellant claimed when he entered the corner store there were four men, three black and one Puerto Rican, and one female in line at the counter. (*Id.* at 147-48.) He could not remember what these individuals were wearing, their ages, or whether the men had facial hair. (*Id.* at 148-50.) Appellant did state that the arrest photos of him were an

accurate depiction of how he looked on the night of September 20, 2006. (*Id.* at 148.)

Quentin Murray confirmed appellant's testimony. Specifically, Mr. Murray testified that he and appellant were playing video games at his house on the evening of September 20, 2006, and that appellant did not leave his home until approximately 11:30 p.m. (N.T.T. at 132-34.) Mr. Murray's home at that time was approximately two or three blocks from the intersection of Dorwart and Manor Streets. (*Id.* at 135.) Mr. Murray positively identified appellant as the individual in the arrest photos taken on September 20, 2006. (*Id.* at 137; Commonwealth exhibit no. 2.)

Lastly, through a stipulation with the Commonwealth, the defense offered the fact that on Officer Smith's report of the "buy-bust," in the area for the description of the suspect, he failed to check the boxes for whether the suspect had a mustache and a beard.

Appellant claims that the evidence which he presented proves that "it would be impossible for him to be the perpetrator of the cocaine delivery." (See motion to vacate jury verdict as against the weight of the evidence at ¶11.) Initially, appellant disputes Officer Smith's testimony that the suspect was wearing "long shorts," when the photo of appellant showed him wearing pants that went down to his ankles. This is a disingenuous argument given the rather lengthy testimony and explanation regarding appellant's clothing. When Officer Smith first described what appellant was wearing below the waist, he used the term "knickerbocker shorts, or they are pretty much long shorts." (N.T.T. at 52.) By the term

"knickerbocker," Officer Smith meant, "capris for men" that went just to the ankle. (*Id.* at 64, 68.) He explained they were not traditional blue jeans because they were not tapered down the leg. (*Id.* at 68.) Rather, they were ill-fitting "flood water jeans" that only went to the ankle. *(Id.)* Appellant cannot honestly argue that this dispute about whether his pants went far below the knee or above the ankle makes it "impossible" for him to have been the suspect in this case.

Next, appellant claims the arrest report indicated that the seller did not have a beard or a mustache. There was no testimony by any police officer as to appellant's facial hair or lack thereof. The arrest photo, introduced by the Commonwealth, did evidence a "slight mustache" and "little beard." (N.T.T. at 148.) These photos were displayed to the jury and it was for them to decide whether the testifying officers' descriptions of appellant were accurate and credible.

Additionally, appellant argues that the contradictory testimony of Officer Smith, who testified that the drug sale took place while the seller was outside the car, and Detective Breault, who testified that the seller was inside the car, indicates that they were referring to two different people. Officer Smith identified the suspect that approached his car and ultimately sold him crack cocaine as a black male "wearing a black fitted baseball cap" with an insignia on it, "black zip-up hoodie that was tied, and . . . a white t-shirt and knickerbocker shorts." (N.T.T. at 48, 52.) Detective Breault testified unequivocally that a black male "wearing a black hooded sweatshirt, white t-shirt underneath, and a black hat," made contact with Officer Smith, entered the corner store, exited the corner

store, and returned to Officer Smith's vehicle. (*Id.* at 100-101, 103, 110-11.) Detective Breault noted that these undercover operations are a "dangerous business, so as soon as one of our officers comes into contact with somebody, [he] put[s] the description of this individual out on the radio right away." (*Id.* at 102.) Thus, before any drug deal occurred, in or out of the car, Detective Breault broadcast a description of the suspect that was identical to the one given by Officer Smith to the surveillance team following the drug transaction. (*Id.* at 53-54.) These two trained officers were not referring to two different people as suggested by appellant.

Appellant further contends that the uncontradicted evidence at trial that, at the time of his arrest, he had no money, no drugs and no merchandise that had a value of $20, proves that he could not have entered the store with the $20 in buy money that was recovered from the store's cash register. According to appellant, such would indicate that appellant received no compensation for the drug sale. Yet, defense counsel raised the specter of appellant's "compensation" when he asked the prosecuting officer if appellant had been tested for the presence of cocaine in his system, and Officer Lowe responded in the negative. (N.T.T. at 121.) Appellant could very well have received his "compensation for the sale" in the form of cocaine, which he may have consumed prior to his arrest.

Lastly, appellant argues there was credible evidence that other persons were in the corner store that evening, and no evidence that these individuals who had allegedly been in the store could not have exited through a back door. Appellant did testify that when he entered the

corner store there were four men, three black and one Puerto Rican, and one female lined up at the counter. (N.T.T. at 147-48.) He could not, however, remember what these individuals were wearing, their ages, or whether the men had facial hair. (*Id.* at 148-50.) Thus, there was no credible evidence that any of these alleged customers matched the general description of the individual identified by the undercover team and surveillance team: "Black male, approximately . . . five-eight, five-eleven in height, black ball cap, black zip-up hoodie, white t-shirt, blue knickerbocker shorts." (*Id.* at 56, 101.)

After carefully reviewmg the entire record and considering the relevant facts and law, this court cannot find that the verdict in this case was so contrary to the weight of the evidence that it shocks its sense of justice. Although there were contradictions between the appellant's and the Commonwealth's evidence, as well as disputed contradictions within the exhibits, the weight to be given such contradictions is for the jury, not for the court. The jury was free to believe all, part, or none of the testimony presented at trial. The verdict as rendered by the jury clearly indicates that the jury resolved the inconsistencies in the testimony in the Commonwealth's favor, and to appellant's detriment. This trial court cannot and should not overturn a jury's verdict merely because of a conflict in the testimony. *Commonwealth v. Edwards,* 588 Pa. 151, 168, 903 A.2d 1139, 1148 (2006). A review of the record in this case shows that the totality of the evidence presented in this case, as received, evaluated and judged by the jury, was clearly of adequate weight to support the verdicts of guilty on all counts. For these

reasons, appellant's appeal based upon a weight of the evidence claim should be denied.

### III. CONCLUSION

For the reasons set forth above, appellant's issues on appeal are meritless and his conviction should be affirmed.

Accordingly, I enter the following:

### ORDER

And now, November 3, 2008, the court hereby submits this opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure.