J-A20033-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES E. KARR | : | |
| | : | |
| Appellant | : | No. 1510 WDA 2018 |

Appeal from the Judgment of Sentence Entered September 20, 2018
in the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0001155-2015

BEFORE:  BOWES, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    FILED NOVEMBER 12, 2020

James E. Karr ("Karr") appeals from the judgment of sentence imposed following his conviction of one count of second-degree murder, two counts each of aggravated arson and cruelty to animals, and three counts of arson.[1] We affirm.

_____

[1] See 18 Pa.C.S.A. §§ 2502(b); 3301(a)(1)(i), (ii), (a.1)(i), (ii); 5511(a)(2.1)(i)(A).

In its Opinion, the trial court detailed the factual and procedural history underlying the instant appeal, which we adopt as though fully set forth herein. See Trial Court Opinion, 10/29/19, at 1-9.[2, 3]

Karr filed a timely Notice of Appeal and a court-ordered Pa.R.A.P. 1925(b) concise Statement of errors complained of on appeal.

On appeal, Karr raises the following issues for our review:

I. Did the trial court err in admitting statements that [] Karr made to police, as [] Karr was subject to a custodial interrogation that violated Miranda v. Arizona[, 384 U.S. 436 (1966)], and/or the statements were not voluntarily made?

II. Did the trial court abuse its discretion in admitting multiple instances of "prior bad acts" evidence under Pa.R.E. 404(b) over defense objection?

III. Did the trial court abuse its discretion in admitting the Facebook posts that Doreen Collins [("Collins")] read into evidence, as the posts were not properly authenticated?

Brief for Appellant at 6.

In his first claim, Karr asserts that the trial court erred in failing to suppress all of the statements he made while he was in police custody. Id. at 16. Karr claims that

_____

[2] Firefighters found the burned remains of a dog in the residence.

[3] Relevantly, on December 8, 2015, Karr filed a Motion to Suppress the statements he made to police, and evidence recovered from his cell phone and other searches. Karr argued that police obtained the statements, in violation of Miranda, after he had requested an attorney and indicated that he did not wish to speak with police. Following a suppression hearing, the court granted suppression as to all statements Karr made prior to 4:49 p.m.

> [d]uring a more that 13.5-hour custodial detention, [] Karr's free will was overborne through physical and mental pressure, and extraordinarily coercive interrogation techniques that culminated with [] Karr only making an inculpatory statement more than 12 hours after the custodial interrogation and detention began and only after repeatedly (and to no avail) invoking his rights to counsel and to remain silent.

Id. According to Karr, he was worried about not being able to take his anti-seizure medication while he was in custody, and he only gave his consent for police to search his mother's home so that he could get his medication more quickly. Id. at 22. Karr claims that he was not provided with any food until after 3:00 p.m. Id. at 24. Karr also argues that he was tired after being detained for more than 12 hours. Id. at 24-25. According to Karr, the detectives told him "to respect [the victim's] memory by confessing...." Id. at 27. Karr contends that the detectives continued to pressure him to confess, even when he said he could not remember what had happened that night. Id. at 27-28. Additionally, Karr argues that a third detective entered the room at 6:33 p.m., and "suggested a scenario of reduced culpability." Id. at 29; see also id. (arguing that Karr's statement mirrored the explanation offered by the third detective). Karr avers that the police violated Karr's right to counsel several times; the police did not honor Karr's asserted right to remain silent and Karr's final waiver of his Miranda rights was invalid, because it was induced by coercion, and therefore, involuntary. See id. at 30-43. Karr also claims that his statement was involuntary under the totality of the circumstances, including the length and condition of detainment, police

attitudes toward Karr, and Karr's physical and psychological state. See id. at 43-47.

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

Commonwealth v. Jones, 121 A.3d 524, 526-27 (Pa. Super. 2015) (citation, brackets and ellipses omitted).

In its Opinion, the trial court set forth the relevant law, addressed Karr's claim, and concluded that it lacks merit. See Trial Court Opinion, 10/29/19, at 9-13. The trial court acknowledged that Karr had invoked his right to counsel early in the interrogation. See id. at 11. However, the trial court concluded that Karr's confession was voluntary, stating that "[a]fter a lengthy break during which [Karr] sat alone, sometimes appearing to doze, [Karr], on his own volition, sought out detectives, waived his rights to incriminate himself and to counsel[,] and provided a detailed confession to the murder of [the victim]. [Karr's] decision to confess was unconstrained and free." Id. at 13;

- 4 -

see also id. at 11-12 (stating that Karr voluntarily, and "on his own initiative," knocked on the door of the interrogation room at approximately 4:54 p.m. and asked to speak to detectives). The record supports the trial court's factual findings, and we discern no abuse of its discretion in its legal conclusions. See Commonwealth v. Edwards, 903 A.2d 1139, 1150-51 (Pa. 2006) (affirming suppression court's finding, which was supported by the record, that the appellant, not the police corporal, who initiated further conversation after initially invoking his right to counsel). Therefore, for the reasons stated by the trial court, see id. at 9-13, Karr is not entitled to relief on this claim.

In his second claim, Karr avers that the trial court abused its discretion by admitting evidence of prior bad acts under Pa.R.E. 404(b).[4] Brief for Appellant at 48. Karr claims that the Commonwealth introduced evidence regarding previous allegations of domestic violence between Karr and the victim, with the prejudicial intention of portraying Karr as a serial abuser. Id. According to Karr, the trial court incorrectly determined that the evidence was probative of Karr's motive, and as a chain or sequence of events leading to the instant crime. Id. at 49. Instead, Karr argues, the challenged incidents

_____

[4] Pennsylvania Rule of Evidence 404(b)(2) provides that evidence of crimes, wrongs or other acts "may be admissible for ... proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case[,] this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

were distinct, and many occurred long before the arson. Id. Karr specifically challenges testimony concerning the following incidents:

⎦ Testimony concerning a 2011 incident at the victim's house, during which the victim told the responding officer that Karr was intoxicated and had thrown her down the stairs, and Karr was found with a bottle of lighter fluid and threatening to burn down the house;

⎦ Testimony that in a 2014 call to the victim's house, police found Karr intoxicated, and the tires of victim's car were punctured; and

⎦ The court record keeper's testimony concerning the victim's pursuit of a Protection From Abuse Order against Karr.

Id. at 50-57.

In its Opinion, the trial court set forth the standard of review and relevant law concerning the admission of Rule 404(b) evidence, addressed Karr's claim, and concluded that it lacks merit. See Trial Court Opinion, 10/29/19, at 13-17. The court reviewed the testimony of each challenged incident, and concluded that "[e]ach instance of conduct was probative of the fact that [Karr's] animus [towards the victim] continued to escalate over time until [Karr's] actions resulted in the ultimate crime, the murder of [the victim]." Id. at 16. Additionally, the trial court concluded that any error in its admission of the evidence was harmless, in light of the overwhelming evidence of Karr's guilt, including his own confession. Id. at 16-17. Discerning no abuse of the trial court's discretion, we affirm on the basis of its Opinion as to Karr's second claim. See id. at 13-17.

- 6 -

In his third claim, Karr contends that the trial court erred by admitting Facebook posts, which were read into evidence by the victim's friend, Collins. Brief for Appellant at 58. Karr argues that the Facebook posts were not properly authenticated, "as neither direct nor circumstantial evidence established that [] Karr authored the posts." Id. According to Karr, Collins's testimony that Karr had sent her a friend request on Facebook was insufficient to establish that the challenged posts were, in fact, authored by Karr. Id. at 60; see also id. at 61 (arguing that "there was no evidence that [] Karr told Collins that he wrote the posts."). Karr claims that the posts were not personal correspondence between him and Collins; Collins had no intimate knowledge regarding his statement of mind at the time; and Collins acknowledged that she had not spoken with Karr about these posts. Id. at 61-62.

In its Opinion, the trial court set forth the relevant law regarding authentication of evidence, addressed Karr's claim, and concluded that it lacks merit. See Trial Court Opinion, 10/29/19, at 17-20. The trial court stated that "[f]irst and foremost, [Karr] admitted to detectives during his interrogation that he authored some of the posts." Id. at 19-20. As we upheld the trial court's determination that Karr's Miranda rights were not violated, supra, we reject Karr's apparent contention that we may not consider Karr's own admissions regarding the Facebook posts. Additionally, the trial court concluded that there was sufficient circumstantial evidence, presented through Collins's testimony, to corroborate Karr's identity as the author of the

Facebook posts. Id. at 20. We discern no abuse of the trial court's discretion, and affirm on the basis of its Opinion in rejecting Karr's final claim. See id. at 17-20.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/12/2020

Circulated 10/16/2020 03:54 PM

FILED

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
2019 OCT 28 PM 2:05 CRIMINAL DIVISION

DEPT OF COURT RECORDS
CRIMINAL DIVISION
ALLEGHENY COUNTY, PA

COMMONWEALTH OF PENNSYLVANIA      )
                                  )
              vs.                 ) CC No. 2015-01155
                                  )
JAMES E. KARR,                    )
                                  )
              Defendant.          )        ORIGINAL
                                  )        Criminal Division
                                  )        Dept Of Court Records
                                           Allegheny County, PA

**OPINION**

Mariani, J.

This is a direct appeal wherein the defendant appeals the Judgment of Sentence of September 20, 2018.[1]    After a non-jury trial, the defendant was found guilty of second-degree murder, two counts of aggravated arson, three counts of arson and two counts of cruelty to animals.    The defendant was sentenced to a mandatory term of life imprisonment relative to the conviction for second-degree murder.  He was sentenced to a consecutive term of imprisonment of not less than 10 years nor more than 20 years at one arson conviction and a consecutive term of imprisonment of not less than one year nor more than two years at the cruelty to animals conviction.   The court either imposed no sentence at some of the remaining convictions due to merger or it imposed no further penalty.  This appeal followed.

---

[1]  This case was originally assigned to the Honorable Donna Jo McDaniel.  Judge McDaniel presided over various pretrial matters, including the suppression motion/hearing.  This case was later assigned to this member of the court.

The evidence adduced in this matter relates to a fire that occurred at a residence located at 132 Friendship Street in Duquesne, Pennsylvania during the late hours of December 29, 2014 and the early morning hours of December 30, 2014. Maureen Karr, the defendant's estranged wife, was found dead in that house. During the investigation, the defendant was determined to be a person of interest. He was taken into custody on December 30, 2014 and detectives with the Allegheny County Police Department attempted to interview him. The defendant immediately requested an attorney. At approximately 5:35 a.m. on that date, he was transported to the headquarters of the Allegheny County Police Department and was placed in a "General Investigations" interview room. At approximately 6:50 a.m., detectives advised the defendant of his Miranda rights. Detectives began interrogating the defendant. The defendant was not free to leave. Detectives obtained biographical information from the defendant. At approximately 7:34 a.m., the defendant was moved into an interview room in the homicide unit of the Allegheny County Police Department. At approximately 8:04 a.m., the defendant was provided with a written Miranda rights form. Shortly thereafter, detectives requested that the defendant consent to a search of his residence, his cell phone and to submit to a collection of his DNA. The defendant consented to these searches. At approximately 10:24 a.m., the defendant advised detectives that he did not want to speak with them and he again requested the services of an attorney. Despite being aware of these representations of the defendant, Detective Feeney attempted to continue his interrogation of the defendant about the fire at 132 Friendship Street. The defendant, however, did not provide any statements. At approximately 4:54 p.m., after having been left alone in the interview room for a substantial period of time, the defendant knocked on

2

the door of the interview room and got the attention of Sergeant Scott Scherer. The defendant advised Sergeant Scherer that he now wanted to speak with detectives about the fire. Sergeant Scherer contacted other detectives who went back in to speak with the defendant. The defendant was again read his Miranda rights and presented with a written Miranda rights form at approximately 4:59 p.m. The defendant was interviewed by detectives until approximately 5:35 p.m. After a 10-minute break, the interrogation continued from approximately 5:46 p.m. until 7:30 p.m. During the interrogation that began at 4:59 p.m., the defendant admitted that was at the residence on December 29, 2014 and he argued with Maureen Karr. He claimed that his wife came toward him with an axe and, as he pushed his wife away, and she hit her head on a wall. He claimed he attempted to resuscitate her. When he could not resuscitate her, he bound her hands behind her back, doused her with vodka and made a trail of vodka to the door. He then lit the vodka and went out the back door of the residence.[2]

The defendant was in police custody for approximately 13 ½ hours on December 30, 2014 prior to confessing to setting the fire that killed Maureen Karr. The events surrounding the entirety of the defendant's time in custody at the Allegheny County Police Department were recorded. This Court viewed the recorded audio/video of the defendant's time in custody. During this time period, the defendant actual interacted with law enforcement officer for approximately 3 ½ hours. The defendant was repeatedly

---

[2] Judge McDaniel ruled that the defendant had immediately invoked his right to remain silent and his right to counsel upon being taken into custody. Judge McDaniel, therefore, suppressed all statements made by the defendant prior to 4:49 p.m., the time at which the defendant knocked on the interview room door and asked to speak to the detectives.

3

permitted to have cigarettes, he was provided food and beverages and he was permitted to use the restroom when needed. He also seemed to nap at times.

Trial testimony established that very late on December 29, 2014 into the early morning hours of December 30, 2014, Cheryl Rouse, a neighbor residing at 135 Friendship Street, observed smoke coming from the residence at 132 Friendship Street. Due to her concern about the origin of the smoke, Ms. Rouse called the defendant's cell phone. Ms. Rouse believed the defendant still resided at 132 Friendship Street at the time of the fire and she told him to get out of the house. The defendant informed Ms. Rouse that he didn't live at the residence anymore because his wife, Maureen Karr, has obtained a Protection From Abuse ("PFA") order against him and he wasn't permitted in the house. He told Ms. Rouse that Maureen Karr was probably not in the house because she was out with her boyfriend. Ms. Rouse expressed concern about Maureen Karr's well-being and she told the defendant that Maureen Karr's vehicle was outside of the residence. The defendant sounded unconcerned and Ms. Rouse hung up the phone. She then went to the burning residence and encountered police officers and fire personnel.

John Brucker, the Chief Deputy Fire Marshal with the Allegheny County Fire Marshal's Office, testified that the charred body of Maureen Karr was found lying facedown in the living room of the residence. Her wrists were bound behind her back with a light gauge wire. Wire was also observed around the victim's neck. Chief Deputy Brucker and his team investigated the cause and origin of the fire. Ethanol, an ignitable liquid which is commonly found in alcohol, was found in the carpet in front of refrigerator located in the kitchen of the residence.

4

Chief Deputy Brucker opined that the fire was arson. He provided an expert opinion in this case that the fire started in the living room of the residence, the fire was not accidentally set and that the fire was incendiary in nature.

Trial testimony established that cause of death in this case was smoke inhalation and carbon monoxide poisoning. Due to the fact that a high level of carbon monoxide was present in Ms. Karr's lungs, it was determined that Ms. Karr had been breathing just prior to her death. As a result of the fire, Ms. Karr's hands and feet burned off from her body, however, the bones from her hands, feet and neck were bound by wire. According to the forensic pathologist who testified in this case, the manner of death was homicide.

Law enforcement officers obtained video surveillance from a BP gas station located on Buttermilk Hollow Road. The video showed that on December 30, 2014 at approximately 12:29 a.m., the defendant exited a Jeep Liberty vehicle and walked up to an ATM machine at the BP gas station. At approximately 12:42 a.m., the defendant walked away from the BP gas station.

Cliff Jackene testified that he was a friend of the defendant. He testified that he picked the defendant up at the defendant's mother's house on December 29, 2014 between 5:30 and 6:00 p.m. and they went to Craig's Bar in Duquesne, Pennsylvania. Mr. Jackene testified that Craig's Bar was approximately a block and a half from Maureen Karr's residence at 132 Friendship Street. Mr. Jackene further testified that he and the defendant left Craig's Bar around 7:30 p.m. and went to Harvey Wilner's,

5

another bar/restaurant approximately three and one-half blocks from Maureen Karr's residence. After approximately 15 to 20 minutes, the two men went to Lance Ludwick's house, another friend who lived about two and one-half blocks from Ms. Karr's residence. The defendant remained there for another 15 to 20 minutes. The defendant left that residence alone and on foot. When he left, the defendant was carrying a backpack.

Mr. Jackene eventually left Mr. Ludwick's residence and tried to locate the defendant. He did not find the defendant but the defendant did call Mr. Jackene shortly after midnight and asked for a ride home. Mr. Jackene agreed to drive him part of the way home. Shortly after the phone call, the defendant appeared at Mr. Jackene's residence. Mr. Jackene drove the defendant to the BP gas station on Buttermilk Hollow Road in Mr. Jackene's silver Jeep Liberty vehicle. Mr. Jackene dropped the defendant off there where the defendant was supposed to meet the defendant's mother.

After Mr. Jackene arrived home, he went to bed. He was awakened by a knock at his door. Lance Ludwig was standing there and he pointed toward Maureen Karr's residence. Mr. Jackene observed that the residence was on fire. Mr. Jackene immediately telephoned the defendant about it and the defendant denied any knowledge of the fire.

The Commonwealth also admitted evidence of prior incidents involving the defendant and Maureen Karr. Duquesne Police Officer Fred Hill testified that he

6

responded to a domestic violence call at 132 Friendship Avenue on October 23, 2011. When Officer Hill arrived, Maureen Karr was standing on the steps in front of the residence in an excited state. She was crying and was visibly upset. She was holding her ribs. She informed Officer Hill that she had been fighting with her husband. She told Officer Hill that the defendant was intoxicated, he had assaulted her and he had thrown her down some steps. She said the defendant threatened to burn down the house and he had gone to the basement with lighter fluid. Officer Hill called for an ambulance to treat Ms. Karr's injuries and then went into the house.

When he entered the residence, Officer Hill observed a broken bannister leading into the basement. He went to the basement and located the defendant sitting at a computer table. To the right of the defendant was a bottle of lighter fluid. The defendant began threatening to burn the house down. He told Officer Hill that he had doused himself in lighter fluid. The defendant was arrested and taken into custody. The charges were eventually dismissed after the defendant sought domestic violence counseling.

Sergeant Melissa Kuks of the Duquesne Police Department testified that she responded to an incident on December 12, 2014 at 132 Friendship Street involving the defendant. She testified that, upon arriving at the residence, she encountered the defendant outside the residence. She noticed that the four tires on Maureen Karr's vehicle were sliced and were losing air. Upon being questioned about the tires, the defendant responded that he could cut the tires of his vehicle if he wanted to do so.

7

Beth Keenan, an administrator in the PFA department of the Family Division of the Allegheny County Court of Common Pleas, testified that Maureen Karr had obtained a PFA order against the defendant. Ms. Keenan described the process of obtaining a PFA order. She explained that a victim can obtain an emergency temporary PFA order if she suffers abuse at the hands of another person. Ms. Keenan testified that a PFA order had been issued to Maureen Karr and that the order barred the defendant from the residence at 132 Friendship Street. She explained that the order further precluded the defendant from having contact with Ms. Karr.

Doreen Collins testified that she was the best friend of Maureen Karr. Approximately six to eight months prior to December 29, 2014, Ms. Collins was with Maureen Karr at Ms. Karr's residence. The defendant was arguing with Ms. Karr on the backyard deck. At one point, the defendant threatened to burn down the residence if Ms. Karr did not permit the defendant to have the house. Ms. Collins also testified that she recognized Facebook posts from the defendant's Facebook account that were relevant to this case. She was aware that Maureen Karr had her own Facebook account because the account was created using Ms. Collins' computer while Ms. Karr was at her residence. Ms. Collins testified that she was aware of a Facebook account with a profile name of "James Karr." The "James Karr" Facebook account sent a "friend request" to Ms. Collins' Facebook account. Ms. Collins recognized various posts on the "James Karr" Facebook page that related to Maureen Karr and Ms. Collins directly. Threatening posts were made about a week prior to the PFA hearing and the posts continued right up until the day before the PFA hearing. For example, one of the posts states, "To my wife, I'll

8

give you a divorce if you give me three months of marriage counseling." Another post read, "Just remember honey, you made a commitment 15 years ago, and you didn't live up to it." During his interrogation while in custody, the defendant admitted to authoring this post on Facebook. Another post stated, "I just want to say good-bye to my wife. There is no way I can win as long as Doreen Collins is in the picture. Maybe I'll see you on the other side. I love her and goodbye." Another long post contained the following relevant message: "It's no use going to court tomorrow. I'm not going to get my wife back..."

At the conclusion of the non-jury trial, this court convicted and sentenced the defendant as set forth above. The defendant raises a number of issues on appeal. Defendant's first two issues relate to his confession, alleging that the confession should have been suppressed. As noted above, Judge McDaniel suppressed all statements made by the defendant prior to 4:59 p.m. on December 30, 2014. Defendant's first claim is that all statements made by him after 4:59 p.m. on that date should have been suppressed because detectives failed to honor his invocation of his right to counsel. Based upon this court's reading of the suppression hearing transcript, it believes Judge McDaniel denied suppression because she believed the defendant initiated further communication, exchanges, or conversations with the police, and he knowingly and intelligently waived his right to counsel at that time.

In Miranda v. Arizona, 384 U.S. 436, 479 (1966), the United States Supreme Court explained:

9

To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

As set forth in Commonwealth v. Best, 789 A.2d 757, 762 (Pa. Super. 2002):

[T]he protective provisions of Miranda prohibit the continued interrogation of an interviewee in police custody once he or she has invoked the right to remain silent and/or to consult with an attorney. Commonwealth v Rucci, 543 Pa. 261, 670 A.2d 1129 (Pa.Super. 1996). "Interrogation" means police questioning or conduct calculated to, expected to, or likely to evoke an admission. Commonwealth v Brown, 551 Pa. 465, 711 A.2d 444 (Pa.Super. 1998). Where an interviewee elects to give an inculpatory statement without police interrogation, however, the statement is "volunteered" and not subject to suppression, notwithstanding the prior invocation of rights under Miranda Id; Commonwealth v. Bracey, 501 Pa. 356, 461 A.2d 775 (Pa.Super. 1993); Commonwealth v. Abdul-Salaam, 544 Pa. 514, 678 A.2d 342 (Pa.Super. 1992). Interrogation occurs when the police should know that their words or actions are reasonably likely to elicit an incriminating response, and the circumstances must reflect a measure of compulsion above and beyond that inherent in

10

custody itself. See Commonwealth v. Fisher, 564 Pa. 505, 769 A.2d 1116. (Pa.Super. 2001)(emphasis supplied).

Additionally, in Commonwealth v. Poplawski, 130 A.3d 697, 711-12 (Pa. 2015), the Pennsylvania Supreme Court explained:

> Where ... an accused invokes his Fifth Amendment rights during a custodial interrogation but later provides an incriminating statement, this Court reviews the voluntariness of the accused's statement by examining whether authorities refrained from further interrogation until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. See Commonwealth v. Keaton, 45 A.3d 1050, 1067 (Pa. 2012) (invocation of Fifth Amendment right to counsel shields arrestee from further interrogation until counsel is present, unless arrestee initiates further conversation with police). In Commonwealth v. Hubble, 504 A.2d 168 (Pa. 1986), this Court held that a confession given after a defendant invokes his right to counsel need not be suppressed where the defendant: "(1) initiated further communication, exchanges, or conversations with the police, and (2) knowingly and intelligently waived the right to counsel." Id. at 175.

The suppression record clearly demonstrates that the defendant invoked his right to counsel up until he knocked on the interrogation room door at 4:54 p.m. on December 30, 2014. Sergeant Scherer, who was not actively assigned to investigate the fire at 132 Friendship Street, was in the Homicide office when he heard knocking on the door of the interrogation room. When he opened the door, the defendant informed Sergeant Scherer that he wanted to speak to detectives. Sergeant Scherer then summoned detectives to speak with the defendant. Detective Langan and Detective Feeney went to the interrogation room and met with the defendant. At 4:59 p.m., they provided the defendant with a written form containing Miranda rights and the defendant waived those

11

rights. After the defendant waived his right to remain silent and his right to an attorney, the detectives did not act aggressively toward the defendant and there was nothing coercive about the interaction between the defendant and the detectives. The record reveals that the defendant, on his own initiative, reached out to the detectives to speak with them and that he knowingly and intelligently waived the right to counsel. Accordingly, this claim fails.

Defendant also claims that his confession should have been suppressed because, under the totality of the circumstances, his confession was not voluntarily made. "[T]he voluntariness of a confession is determined by the totality of the circumstances." Commonwealth v. Templin, 795 A.2d 959, 963-964 (Pa. 2002) (citation omitted). In Templin, the Pennsylvania Supreme Court has explained as follows:

> In determining voluntariness, the question is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. "By the same token, the law does not require the coddling of those accused of crime. One such need not be protected against his own innate desire to unburden himself." Commonwealth v. Graham, 408 Pa. 155, 162, 182 A.2d 727, 730–31 (1962). Factors to be considered in assessing the totality of the circumstances include the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.

Id. at 966 (some internal quotation marks and citations omitted).

It is this court's view that the circumstances of the defendant's interrogation

12

deprived the defendant of making a free and unconstrained choice to confess to the murder of Maureen Karr. While it is true that the defendant was in custody for over 13 hours, this Court has observed no facts that suggest that the interrogation was coercive or that the defendant was placed under duress by detectives. The defendant did not exhibit any signs of mental wear and the conditions of his custodial detention were not oppressive.[3] Although persistent, the interrogators were not overly aggressive. The defendant was provided cigarettes and the opportunity to smoke. He was provided food and beverages during his custodial detention and he was afforded bathroom breaks. He was allowed to nap.

After a lengthy break during which the defendant sat alone, sometimes appearing to doze, the defendant, on his own volition, sought out detectives, waived his rights to incriminate himself and to counsel and provided a detailed confession to the murder of Maureen Karr. Defendant's decision to confess was unconstrained and free. The defendant's confession was voluntary.

The defendant next challenges a number of this Court's evidentiary rulings based on Rule 404(b) of the Pennsylvania Rules of Evidence. While Judge McDaniel preliminarily ruled on a number of these issues pretrial, this court advised the parties that it would revisit the evidentiary issues during the course of the non-jury trial.

"The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion." Commonwealth v.

---

[3] At one point when the interrogators were pressing the defendant, the defendant appeared to chastise the detectives, accusing them of "badgering" him. The defendant then continued to resist their attempts to get admissions from him.

13

Cunningham, 805 A.2d 566, 572 (Pa.Super. 2002), appeal denied, 573 Pa. 663, 573 Pa. 663, 820 A.2d 703 (2003). As a result, rulings regarding the admissibility of evidence will not be disturbed for an abuse of discretion "unless that ruling reflects 'manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous.'" Commonwealth v. Einhorn, 911 A.2d 960, 972 (Pa. Super. 2006).

It is axiomatic that evidence that is not relevant is not admissible. Pa.R.E. 402; Commonwealth v. Robinson, 554 Pa. 293, 304-305, 721 A.2d 344, 350 (1998) ("The threshold inquiry with admission of evidence is whether the evidence is relevant."). Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. See also Commonwealth v. Edwards, 588 Pa. 151, 181, 903 A.2d 1139, 1156 (2006) (evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact).

In Commonwealth v. Broaster, 863 A.2d 588, 592 (Pa. Super. 2004), the Superior Court explained that "[r]elevant evidence may nevertheless be excluded 'if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" See also Commonwealth v. Dejesus, 584 Pa. 29, 880 A.2d 608, 614-615 (Pa. Super. 2005).

14

As set forth in Commonwealth v. Owens, 929 A.2d 1187, 1191 (Pa. Super.2007) quoting Broaster, 863 A.2d at 592,

> Because all relevant Commonwealth evidence is meant to prejudice a defendant, [however] exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case. As this Court has noted, a trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts form part of the history and natural development of the events and offenses with which [a] defendant is charged.

Generally, evidence that a defendant committed other other crimes, wrongs, or acts is inadmissible to prove that a defendant acted in conformity therewith. Pa. R. Evid. 404(b)(1). This type of evidence is admissible, however, when it is offered for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident so long as the trial court concludes the probative value of the evidence outweighs its potential for prejudice. Pa. R. Evid. 404(b)(2), (3). See Commonwealth v. Henkel, 938 A.2d 433, 444 (Pa.Super. 2007).

With respect to the testimony of Officer Hill, Sergeant Kuks, Beth Keenan and Doreen Collins, this Court believes that the defendant's prior domestic violence toward Maureen Karr, his threats to burn down the residence at 132 Friendship Street and the evidence regarding the PFA order was probative of the defendant's motive, intent, preparation and plan. This evidence demonstrated the defendant's motive and intent to

15

commit homicide and arson due to the ill-will he harbored toward Maureen Karr. Evidence concerning his specific prior threats to burn the residence down, including his possession of lighter fluid on one prior occasion, was probative of preparation and planning to set fire to the residence. Each instance of conduct was probative of the fact that the defendant's animus of Ms. Karr continued to escalate over time until the defendant's actions resulted in the ultimate crime, the murder of Maureen Karr. The evidence is further probative because it demonstrates "the chain or sequence of events which formed the history of the case" and it was "part of the natural development of the case," and it "demonstrates [defendant's] motive, malice, intent, and ill-will toward the victim." See Commonwealth v. Jackson, 900 A.2d 936, 940-941 (Superior Court 2006). This court further conducted the required balancing test and did not believe that the probative value of this evidence was substantially outweighed by its prejudicial value. This court, therefore, believes admission of the evidence was proper. However, if admission could be deemed erroneous, the error is harmless. As set forth in Commonwealth v. Williams, 554 Pa. 1, 19, 720 A.2d 679, 687-688 (1998) (citing Commonwealth v. Story, 476 Pa. 391, 383 A.2d 155, 162 (Pa. 1978)):

> Harmless error is established where either the error did not prejudice the defendant; or the erroneously admitted evidence was merely cumulative of other untainted evidence; or where the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

16

As set forth above, there was overwhelming evidence of defendant's guilt presented at trial. The testimony of the deputy fire marshal, the testimony of Mr. Jackene and the defendant's own confession provided overwhelming evidence of the defendant's guilt. Accordingly, no reversible error exists in this case.

Defendant next claims that this court erroneously admitted Facebook posts in this case because they were not properly authenticated. Evidence must be authenticated prior to its admission into evidence, and Pa.R.E. 901 sets forth the principles applicable to authentication and identification of evidence. *See* Commonwealth v.. Serrano, 61 A.3d 279 (Pa.Super.2013). The general principle of authentication is succinctly stated as follows, "When a party offers evidence contending either expressly or impliedly that the evidence is connected with a person, place, thing, or event, the party must provide evidence sufficient to support a finding of the contended connection." The rule provides: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). A piece of evidence can be authenticated through distinctive characteristics, which includes the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Pa.R.E. 901(a)(4). Thus, a piece of evidence may be authenticated by circumstantial proof. Commonwealth v. Collins, 957 A.2d 237 (Pa.2008).

17

In Commonwealth v. Koch, 39 A.3d 996, 1005 (Pa. Super. 2011), *affirmed by an equally divided [Pennsylvania Supreme] court*, 630 Pa. 374,106 A.3d 705 (2014), a case assessing whether electronic communications were properly authenticated, the Superior Court stated:

> [T]he difficulty that frequently arises in e-mail and text message cases is establishing authorship. Often more than one person uses an e-mail address and accounts can be accessed without permission. In the majority of courts to have considered the question, the mere fact that an e-mail bears a particular e-mail address is inadequate to authenticate the identity of the author; typically, courts demand additional evidence.

Id. at 1004. The Court further noted that

> Text messages are somewhat different in that they are intrinsic to the cell phones in which they are stored. While e-mails and instant messages can be sent and received from any computer or smart phone, text messages are sent from the cellular phone bearing the telephone number identified in the text message and received on a phone associated with the number to which they are transmitted. The identifying information is contained in the text message on the cellular telephone. However, as with e-mail accounts, cellular telephones are not always exclusively used by the person to whom the phone number is assigned.
>
> Such was the case herein. Detective Lively testified that he transcribed the text messages, together with identifying information, from the cellular phone belonging to Appellant. He acknowledged that he could not confirm that Appellant was the author of the text messages and that it was apparent that she did not write some of the messages. Regardless, the trial court found that the text messages were sufficiently authenticated to be admissible. The court reasoned that doubts as to the identity of the sender or recipient went to the weight of the evidence, rather than to its admissibility.

18

We disagree. Authentication is a prerequisite to admissibility. The detective's description of how he transcribed the text messages, together with his representation that the transcription was an accurate reproduction of the text messages on Appellant's cellular phone, is insufficient for purposes of authentication where the Commonwealth concedes that Appellant did not author all of the text messages on her phone. We held in *In the Interest of F.P., a Minor*, and courts of other jurisdictions concur, that authentication of electronic communications, like documents, requires more than mere confirmation that the number or address belonged to a particular person. Circumstantial evidence, which tends to corroborate the identity of the sender, is required.

Id. at 1005.

Recently, the Superior Court addressed the authenticity of Facebook messages and explained that the "authentication [of] social media evidence is to be evaluated on a case-by-case basis to determine whether or not there has been an adequate foundational showing of its relevance and authenticity." Commonwealth v. Mangel, 118 A.3d at 1154, 1162 (Pa.Super. 2018). The Mangel Court explained that "the proponent of social media evidence must present direct or circumstantial evidence that tends to corroborate the identity of the author of the communication in question, such as testimony from the person who sent or received the communication, or contextual clues in the communication tending to reveal the identity of the sender." Id.

In this case, the Commonwealth sufficiently established that the Facebook posts at issue originated from the defendant's Facebook account. First and foremost, the defendant admitted to detectives during his interrogation that he authored some of the

posts.    Additionally, from her prior interaction with the defendant, Doreen Collins was aware that the defendant maintained a Facebook page under the name "James Karr." The defendant had personally sent her a "friend request" from the Facebook page. He specifically mentioned Doreen Collins in his Facebook posts and directed the posts to her.  The profile photograph was a photograph of the defendant's dog.   The contents of the Facebook posts related directly the legal issues transpiring between the defendant and Maureen Karr.    Some posts were pleas by the defendant to reconcile with his wife despite the repeated domestic issues between them.  A number of the posts related to court proceedings that were scheduled relative to the PFA order that had been entered against the defendant.  One such post occurred the day before a scheduled court hearing. These Facebook posts provided ample contextual clues that the defendant authored the posts.  This Court believes that the Facebook posts were properly authenticated.


For the foregoing reasons, the Judgment of Sentence should be affirmed.



By the Court:


Date: October 29, 2019

_____
Anthony M. Mariani, J.


20